UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

*Electronically Filed*

| | | |
|---|---|---|
| BRUNSWICK TKTKONNECT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:22-cv-4-RGJ |
| | ) | |
| SHEILA P. KAVANAUGH and | ) | JURY TRIAL DEMANDED |
| KIMBERLY BUNTON, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Brunswick TKTKonnect, LLC ("TBG"), by counsel, for its Complaint against defendants Sheila P. Kavanaugh ("Kavanaugh") and Kimberly Bunton ("Bunton"), alleges and states as follows:

### NATURE OF DISPUTE

1.      Kavanaugh is the Manager of non-party TKTKonnect, LLC (the "Company"), and she and Bunton are officers of the Company's majority Member, non-party TKT & Associates, Inc. ("TKTA," and collectively with Kavanaugh and Bunton, the "TKTA Fiduciaries"). The TKTA Fiduciaries have violated TBG's rights as the Company's other and minority Member by wrongfully freezing TBG out of the Company's day-to-day business operations and financial affairs, usurping and misappropriating Company opportunities, and purporting to terminate TBG's membership interest and expel it as a Member of the Company through an unauthorized, sham "Special Meeting" of the Company's Members.

2.      During the period June to October 2021, while the TKTA Fiduciaries froze TBG out of the Company and kept it in the dark about the Company's business, and while TBG complied

with its obligation under Section 15.1 of the Company's Operating Agreement to pursue and participate in good faith in mediation to resolve the parties' disputes, the TKTA Fiduciaries stole for their own account and benefit at least one valuable corporate opportunity belonging to the Company and both of its Members.  The TKTA Fiduciaries' misappropriation of that Company opportunity—participation in a "Pilot for Nation's First Black Supplier Development Program" (the "Stellantis Opportunity") launched by automobile behemoth Stellantis, N.V. ("Stellantis") and the National Business League—was preceded by the Company's prior efforts to pursue and achieve a business relationship with Stellantis to provide the same managed personnel services that TKTA now purports it can provide Stellantis pursuant to the Stellantis Opportunity. Moreover, the TKTA Fiduciaries' freeze-out of TBG also served as a transparent pretext for the TKTA Fiduciaries' attempt to steal for themselves the benefits of the expected renewal of a long-standing and lucrative managed personnel services contract that the Company has with Toyota Motor Sales, U.S.A., Inc. ("Toyota").

3.      Having exhausted good-faith efforts to resolve this dispute amicably in mediation, TBG demanded that the TKTA Fiduciaries cease their unlawful freeze-out; restore TBG to its full Member status pre-dating the onset of the TKTA Fiduciaries' oppression, including providing immediate access to the Company's email, computer systems, and financial information; and provide TBG with all information relating to the Stellantis Opportunity and the renewal of the Company's contract with Toyota.  The TKTA Fiduciaries refused to do so.  Faced with no other choice but to seek relief for the TKTA Fiduciaries' unlawful conduct, on November 19, 2021, TBG commenced an arbitration before the American Arbitration Association (the "AAA") pursuant to Section 15.2 of the Operating Agreement (the "Arbitration").

4.      The TKTA Fiduciaries refused, however, to acknowledge that the parties' dispute concerning the propriety of the TKTA Fiduciaries' attempt to terminate TBG's membership interest had been properly submitted first to mediation and then to binding arbitration and therefore, pursuant to Section 15 of the Operating Agreement, could not be the subject of further Company action.  Instead, the TKTA Fiduciaries noticed and proceeded with a sham "Special Meeting" of the Company's Members that was held in violation of Section 15 and at which TKTA purported to terminate TBG's membership interest without basis and in violation of Section 12.2 of the Operating Agreement.  The TKTA Fiduciaries have, to date, failed to produce a single piece of evidence to substantiate their allegations that "cause" actually existed to warrant the termination of TBG's membership interest—*i.e.*, TBG's alleged "continuing, substantial deviations from duties" under the Operating Agreement and its failure to cure any such alleged "substantial deviations."  Indeed, as reflected in the video recording and transcript of the bogus "Special Meeting" at which Kavanaugh purported to preside as the Company's Manager and TKTA's representative, TKTA not only failed to present any evidence that could substantiate its allegations, but Kavanaugh ignored and refused to answer TBG's questions pertaining to those pretextual allegations.  At every turn since they launched their campaign in the summer of 2021 to drive TBG out as minority Member of the Company, the TKTA Fiduciaries have acted maliciously and in bad faith to violate the fiduciary duties and contractual obligations owed to TBG.

5.      In the Arbitration, TBG has asserted individual and derivative causes of action against TKTA for breach of fiduciary duties, breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with business relations, and civil conspiracy.  TBG has sought legal, equitable, and injunctive relief and a judgment declaring that TKTA has materially breached the Operating Agreement; that its actions purportedly taken during the bogus

"Special Meeting" were *ultra vires*, null, and void; and that TBG is a Member of the Company owning a 49% membership interest. Pursuant to Section 16.8 of the Operating Agreement, TBG has also sought in the Arbitration an award of attorney's fees incurred in enforcing its rights under the Operating Agreement, at law, and in equity.

6.      In this civil action, TBG asserts causes of action for breach of fiduciary duties, tortious interference with contract, tortious interference with business relations, conversion, civil conspiracy, and for declaratory and injunctive relief against Kavanaugh and Bunton, both of whom were initially named as respondents in the Arbitration but who objected on jurisdictional grounds, thus necessitating this action.

### PARTIES AND CERTAIN NON-PARTIES

7.      Plaintiff TBG is a limited liability company formed under the laws of the State of New Jersey with its principal offices located in Princeton, New Jersey. TBG's Members are Michael Rose ("Rose") and Randy Jones ("Jones"). Both Rose and Jones are residents of the State of New Jersey.

8.      The Company is a women and minority-owned business enterprise formed in February 2015 as a limited liability company under the laws of the Commonwealth of Kentucky.

9.      TBG owns a 49% membership interest in the Company.

10.      Non-party TKTA (the Respondent in the Arbitration) is the Company's other and majority Member, owning a 51% membership interest. Upon information and belief, TKTA is a corporation formed under the laws of the Commonwealth of Kentucky with its principal offices in Louisville, Kentucky.

11.      Upon information and belief, defendant Kavanaugh is a resident of the Commonwealth of Kentucky. She is nominally the Company's Manager. TKTA's 2021 Annual

Report filed with the Kentucky Secretary of State identifies Kavanaugh as TKTA's President, and TKTA's website identifies Kavanaugh as TKTA's Chief Executive Officer.  In addition to being an officer of TKTA, upon information and belief, Kavanaugh is also TKTA's sole Director.  Kavanaugh's daughter, Tierra Kavanaugh Turner ("Tierra") (now deceased), Rose and Jones built the Company following its formation in 2015.

12.    Upon information and belief, defendant Bunton is a resident of the Commonwealth of Kentucky.  She became associated with the Company in 2021, and TKTA's website identifies her as TKTA's President.  Upon information and belief, Bunton has exerted significant influence and control over Kavanaugh's decision-making as the nominal Manager of the Company.

**SUBJECT MATTER JURISDICTION AND VENUE**

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  The matter in controversy exceeds, exclusive of interest and cost, the sum of $75,000.00.  The Parties are citizens of different states.

14.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

**FACTUAL BACKGROUND**

**I.    The Company's Business Was Built Upon a Contract With Toyota.**

15.    After the Company was formed in 2015, Tierra, Rose, and Jones built the Company's business from the ground up.  Neither Kavanaugh nor Bunton had any role in the formation of the Company or in building its business (including, without limitation, securing and expanding the Company's lucrative agreement with Toyota), and neither was involved in the Company's business or operations prior to Tierra's death in April 2020.

16.    The Company's business was founded upon the Master Personnel Services Agreement with Toyota (the "Toyota Contract"), effective April 1, 2016.  The Toyota Contract's

original term was four years and provides for the automatic renewal for two additional one-year terms.

17.     Under the Toyota Contract, the Company provides managed personnel services to Toyota, including the management of payables owed by several Toyota divisions to their vendors and the engagement of third-party suppliers, vendors, and other subcontractors to recruit, manage, train, direct, and supervise personnel with the requisite skills and experience to perform job functions identified and required by Toyota.

18.     The Toyota Contract is presently scheduled to expire in April 2022 and, prior to the advent of the TKTA Fiduciaries' unlawful freeze-out campaign, it was expected that the Toyota Contract would not only be renewed, but that it would be expanded in scope and value consistent with the history of the parties' relationship and the Company's exemplary service.

## II.     TKTA and TBG Are *Jointly* Responsible to Perform the Company's Marketing, Advertising, Sales and Operational Activities, and Each Member is Prohibited From Competing with the Company.

19.     As reflected in Sections 1.9 and 4.3 of the Company's Operating Agreement (a copy of which is attached as *Exhibit A*), Tierra was appointed by the Company's Members as the Company's Manager and the sole representative of the Company's Management Committee. Although the Company's Management Committee was generally responsible for managing the Company's business, the following provisions set forth in Section 9 of the Operating Agreement make TBG and TKTA *jointly* responsible for the Company's marketing, advertising, sales, and operational activities.

20.     Consistent with the understanding and agreement of the Members when they started the Company, Section 9.1 of the Operating Agreement obligates TKTA and TBG jointly to develop marketing and advertising strategies, develop budgets, produce marketing materials, and formulate sales presentations.

21.     Section 9.2.1 obligates TKTA and TBG to "jointly develop sales strategies and client target lists and cooperate in scheduling and performing demonstrations of [the Company] to clients." (Emphasis added).  To that end, TKTA and TBG are required to "regularly provide reports to the other party on sales activities, potential clients, sales calls and results." (Emphasis added).

22.     Section 9.2.2 provides TBG with "the opportunity and the right to market and generate new clients for [the Company]."  Indeed, TBG is required to "use its best efforts to communicate all sales targets and activities" to TKTA.

23.     Section 9.2.2(c) provides that TKTA and TBG will "equally share responsibilities for executing sales, marketing and public relations strategies." (Emphasis added).  Each is obligated to, "in good faith, work toward the successful development and marketing of [the Company], including full and complete communication of any and all factors that impact the potential success of marketing to clients." (Emphases added).

24.     Section 9.3 directs that TKTA and TBG are jointly "responsible for operational activities for [the Company]," and each is required to "exercise good faith in maintaining the credibility of all services at the highest possible level for achieving client satisfaction."  In that regard, TKTA and TBG "share responsibilities for analyzing potential problems and issues relating to [the Company's] clients as needed."

25.     Section 6.4 provides that "[o]n reasonable request, each Member must give the other Members a true accounting of all transactions relating to the business of the Company, and full information of all letters, accounts, writings, and other things which come to its knowledge concerning the business of the Company."

26.    Lastly, Section 6.1 of the Operating Agreement expressly prohibits any Member from pursuing or becoming directly or indirectly interested in any business that competes with the business conducted by the Company.

27.    As detailed below, by freezing TBG out of the Company's day-to-day business activities and operations beginning in the summer of 2021, denying TBG access to basic financial and other Company information, usurping and misappropriating the Stellantis Opportunity, and then acting to terminate TBG as a Member of the Company, the TKTA Fiduciaries have flouted their obligations under the Operating Agreement and the fiduciary duties that they continue to owe to TBG.

**III.    TBG Plays an Integral Role in the Company's Dramatic Growth Through Performance of the Toyota Contract.**

28.    Since the Company's formation, TBG's participation as a Member and its role in the management and operations of the Company, have been critical to the Company's growth and success.  TBG and its principals brought to the Company the managed-personnel service expertise sought by Toyota.  In addition, and in furtherance of the Company's performance under the Toyota Contract, Vignetic (f/k/a The Brunswick Group Associates, Inc.), an affiliate of TBG, has provided information technology, back-office accounting, project management, and workforce-managed services to the Company as a sub-contractor.

29.    With respect to the Toyota divisions it services, the Company is obligated to pay its subcontractors with funds received from Toyota, and the Company is entitled to a variable "Program Fee" applicable to Toyota's "Annual Spend" for personnel and personnel services.

30.    Toyota's Annual Spend has grown exponentially over the course of the Toyota Contract, with 2021's Annual Spend expected to be approximately 14x that of 2016's.  Consistent with that growth, and based upon statements made by Toyota representatives, it is fully expected

that with the anticipated renewal of the Toyota Contract, the average Annual Spend will approach 30x that of 2016's Annual Spend.

31.    To date, the Company's growth has yielded distributions to TBG, as the 49% owner, of approximately $116,000 in 2019 and $328,000 in 2020, and were estimated to be approximately $478,000 in 2021.  Suffice to say, TBG's opportunity to continue to reap the benefits of forming and building the Company, the expected renewal and expansion of the Toyota Contract, and the Stellantis and other Company opportunities has tremendous value.  TBG is entitled to continue to enjoy all the benefits it has earned through its investment of money, time, and labor in building and growing the Company.

### IV.    TKTA Ambushes TBG at a "Dinner Meeting" in NYC and Reveals the Oppressive Scheme to Drive TBG Out.

32.    In early 2021, a company by the name of Integrity MSP approached TBG "out of the blue" to express its interest in purchasing TBG's 49% ownership interest in the Company. TBG informed TKTA of the inquiry.  Although TBG had no interest in selling its membership interest to Integrity MSP or any other party, Integrity MSP abruptly advised that it was withdrawing its interest in purchasing TBG's ownership interest in or about February 2021. Shortly thereafter, in or about May 2021, TBG learned that TKTA's President, Bunton (who succeeded Tierra), had been communicating with Integrity MSP concerning a potential business relationship and forecasted a demonstration by Integrity MSP of its information technology that, according to Bunton, could be an asset to the Company.  Notwithstanding the "coincidence," TBG expressed openness to viewing the Integrity MSP product.  The demonstration, however, never took place.

33.    In June 2021, Bunton informed Rose and Jones (TBG's principals) that Kavanaugh and she were going to be in New York City on June 23, 2021, and suggested that the parties get

together for dinner.  On the evening of June 23, the four met.  Within minutes of sitting down, the true, hidden purpose behind the "dinner" invitation was revealed.  Bunton—who is the President of TKTA but has no official position with the Company—explained that TBG would be receiving letters from TKTA's attorneys alleging that TBG had violated the Company's Operating Agreement by misrepresenting that Vignetic (TBG's affiliate) was a Member of the Company. Bunton then told Rose and Jones that TKTA wanted the letters to lead to the buyout of TBG's interest in the Company.  TBG responded that it had no interest either in selling its interest or in TKTA's "offer."

34.     Not satisfied with TBG's rejection of its "offer," the TKTA Fiduciaries then embarked on a transparent campaign to create the alleged "default" under the Operating Agreement that they believed necessary to expel TBG from the Company that it had founded and built from the ground up—a company that was then, and is now, poised for extraordinary additional growth.

**V.     TKTA Fabricates Unfounded Alleged Breaches of the Company's Operating Agreement, and the Company Notifies TBG that It Intends to Expel TBG as a Member.**

35.     As suggested during its NYC dinner ambush, the Company sent three interrelated letters on June 23, 2021, in furtherance of its plot to force TBG out of the Company.  The first letter, sent by the Company's outside counsel to TBG, alleged that TBG had committed "substantial deviations" from its duties under the Operating Agreement by (i) "using intentionally confusing email addresses and signature blocks in emails with Toyota related to, and during, the administration of [the] Company's business," (ii) "solicit[ing] and respond[ing] to requests for proposals related to Toyota on behalf of another entity," (iii) permitting its affiliate, Vignetic, "to post inaccurate information about [the] Company on its website," and (iv) allowing Vignetic "to send out marketing information to [the] Company's vendors and suppliers."

36.     The Company further threatened TBG that if it failed to cure the contrived alleged "breaches" of the Operating Agreement within one week, the Company would hold a Special Meeting of its Members to expel TBG from the Company.  TKTA's sudden, pretextual, and unlawful effort to force TBG out soon after its "dinner" buy-out overture is undeniable.

37.     In responding to the contrived allegations, TBG pointed out the pretextual double-standard TKTA sought to impose.  Since the formation of the Company in February 2015, Vignetic was engaged in providing information technology and workforce managed services to the Company (through a subcontractor agreement), as well as to Toyota.  A description of its services had been consistently included on its website for years without complaint by the Company or TKTA.  Yet, when TKTA conducts business on behalf of the Company, TKTA's agents do so only through *their TKTA email accounts*, thus creating the false impression that <u>TKTA</u> and the Company are one and the same.

38.     The second letter, sent by the Company's outside counsel to TBG, also accused Vignetic of misrepresenting its relationship with the Company through website content describing the Company "as a joint venture that Vignetic 'launched' in 2015."

39.     The Company nominally asserted that because Vignetic was not a Member of the Company, the use of the word "launch" was inappropriate and was "creat[ing] confusion in the industry and caus[ing] harm to [the] Company's business, marketing, and intellectual property."

40.     To date, the Company has never proffered any evidence to support its contrived claims of "confusion" and "harm."  Nevertheless, the Company reiterated its threat to "terminate TBG's membership in the Company" if Vignetic did not "remove" the alleged offending language from its website and "marketing materials" by June 30.

41.     The third letter, sent by Kavanaugh as the Company's Manager and the sole member of its Management Committee, notified Jones and Rose (TBG's principals) that effective that day, she would be appointing different individuals as the "client relationship managers" between the Company and Toyota.

42.     She unilaterally declared, without any authorization in the Operating Agreement or justification, that Jones and Rose were prohibited from having "any direct contact with any representative of Toyota, its affiliated entities, or contractors on behalf of [the] Company or on behalf of any other entity in contravention of [the] Company's business, relationships, and growth."

43.     Moreover, the letter revealed the TKTA Fiduciaries' decision "to discontinue [Rose's and Jones'] access to the Company email addresses, domain, and servers" and informed Rose and Jones that their access would be "terminate[d]" that day.

44.     Kavanaugh nebulously claimed that "[t]his change will be advantageous to the purpose and goals of [the] Company and its relationship with Toyota" and "will also serve to advance the business of [the] Company."  Of course, given the fact that TBG's principals had been engaged with Toyota from the outset and had developed close working relationships with the client, the only "purpose" of the transparent action was to unlawfully freeze-out TBG and its principals from the Company's operations.

45.     Kavanaugh did not even attempt to explain why the sudden "change" was being made or how it could ever be "advantageous" to the Company to freeze TBG out of the Company's business and relations with Toyota.

46.     Indeed, this "change" was in no way supported by TBG's vital role in the Company's financial performance, as the Company's revenue and profits had grown substantially

in each of the last four fiscal years under TKTA-TBG joint management and TBG's hands-on involvement with the client, and the Company expected that 2021 would be its most profitable year since the commencement of the Toyota relationship.

47.     Nor did Kavanaugh ever explain how such drastic action was authorized by the Operating Agreement or consistent with TBG's right to address and cure the Company's purported complaints.

48.     Not surprisingly, the Company's ill-conceived, oppressive action to terminate TBG's email access had negative consequences.  For example, because TBG's principals were suddenly and completely unable to continue to service the Company's valued client and to respond to or to communicate with their counterparts at Toyota, a Toyota representative had to resort to messaging one of TBG's principals on his LinkedIn account.  The sudden "change" imposed by the Company to drive TBG out of the Company undoubtedly undermined the Company's own interests, compromised its service to Toyota, and damaged TBG's credibility.

49.     Notwithstanding the pretextual nature of the complaints made by TKTA and nominally by the Company, in accordance with Section 12.2 of the Operating Agreement, TBG immediately responded, attended to, and "cured" the Company's contrived complaints.

**VI.    TBG Cures the Company's Alleged Complaints and Demands Mediation to Address the Unlawful Oppression**

50.     TKTA's complaints were contrived, and it has never presented evidence (anecdotal or otherwise) to support its claim that TBG's conduct caused "confusion" or "harm." Nevertheless, TBG took immediate action to address the Company's purported concerns and to cure the allegedly offending website content and email references to Vignetic.

51.     As reflected in an email sent by the Company's outside counsel dated July 1, 2021, and in letters sent by TBG's outside counsel dated July 6 and July 9, 2021, TBG and Vignetic took

immediate action to make the requested changes to Vignetic's website so that it contained no suggestion that Vignetic (rather than its affiliate TBG) was a Member of the Company.

52.     TBG and Vignetic further assured the Company that, going forward, no such suggestion would be made in any of Vignetic's marketing materials, communications, or otherwise.

53.     TBG also made clear to the Company that neither it nor Vignetic had solicited business in competition with the Company and that, as the Company knew and understood, TBG had acted only to originate new business for the benefit of the Company and to further solidify the Company's relationship with Toyota.

54.     TBG reiterated that there was absolutely no basis for the Company to suggest that TBG or Vignetic had harmed the Company's relationship with Toyota or any potential customer.

55.     Accordingly, TBG asserted that there was no legitimate basis for the "Special Meeting" called by the Company, at which TKTA and the Company intended to expel TBG as a Member.  TBG demanded that the Company and TKTA withdraw the notice of the Special Meeting.

56.     TBG also advised that, in the event that TKTA and the Company were intent to go forward with the sham meeting and their unlawful effort to expel TBG, TBG demanded mediation to address the parties' dispute pursuant to Section 15.1 of the Operating Agreement.

57.     Notwithstanding its good faith efforts to address the Company's purported complaints—for which the Company never provided any evidentiary basis—the Company insisted that an email be sent to Toyota to clarify any potential misunderstanding.  As a further sign of its good faith, TBG drafted a proposed email but expressed its concerns that any such email would

likely *cause confusion* rather than provide clarity on an issue that seemingly did not require clarification in the first instance.

58.    And as a separate matter, TBG sought disclosures concerning a loan transaction involving a third party that was apparently secured by the Company without the knowledge or consent of TBG and in violation of the Operating Agreement.  Upon information and belief, the loan was for more than $400,000 and was obtained solely for the benefit of <u>TKTA</u>.  TBG reissued its demands for disclosures concerning the loan by letter dated July 23 from its outside counsel. But the Company has not, to date, provided any of the disclosures sought and has not disclosed to TBG any other facts related to the *ultra vires* loan transaction.  While TKTA has played fast and loose with baseless allegations of self-dealing, it plainly has unclean hands.

59.    By letter dated July 6, 2021, TBG gave notice of its demand for mediation in the hopes of resolving amicably the dispute created by the TKTA Fiduciaries to force TBG out of the Company.

60.    TBG made a formal demand for mediation before the AAA on August 3, 2021. After the selection of a mediator, the first session of the mediation took place in Kentucky on September 10, 2021, and continued remotely thereafter through October 5, 2021.  Notwithstanding the mediator's good offices, no settlement was achieved.

VII.    **TBG Learns that While It Was Frozen Out of the Company's Operations and Communications, TKTA Stole the Stellantis Opportunity.**

61.    TBG and Tierra—jointly representing the <u>Company</u>—were intimately involved and responsible for cultivating a business relationship with Stellantis dating back to 2017.  Stellantis became interested in the Company's services due to the Company's track record, experience, and the programs it developed and performed for Toyota.

62.     Building off of their outreach and communications with Stellantis, Rose, Jones, and Tierra traveled to Texas on behalf of the Company in or about June 2018 and met with representatives of Stellantis during an event held by the Women's Business Enterprise National Council.  This meeting led directly to the Company's first opportunity for a business relationship with Stellantis.

63.     On or about August 6, 2018, Stellantis (then known as Fiat Chrysler Automobiles) issued a "Managed Service Provider Services for Supplemental Resources RFI – Request for Information" (the "Stellantis RFI").

64.     At that time, Stellantis was generally evaluating "its end-to-end Managed Service Provider (MSP) and accompanying Vendor Management Services" to determine whether there were "more efficient and effective delivery solutions in the market."

65.     The purpose of the Stellantis RFI was to request information from suppliers of such services (like the Company) concerning their experience, capabilities, service and support offerings, and pricing for a proposal that addressed Stellantis's needs in acquiring and managing a workforce spanning the professional, engineering, manufacturing, administrative, and IT labor categories.

66.     Stellantis delivered its RFI specifically to the Company, rather than to either of its individual Members.

67.     On or about August 29, 2018, the Company delivered to Stellantis its "RFI Response for Managed Service Provider Services for Supplemental Resources."  Rose and Jones worked closely with Tierra in preparing the Company's RFI Response.

68.     The Company expended substantial time, effort, and resources in preparing its RFI Response.  It did so only for the benefit of the Company and both of its Members.

69.     Although the Company's RFI Response did not then result in a contract with Stellantis, the Company continued to communicate with Stellantis and pursue a potential business relationship for the provision of managed personnel services.  To that end, Rose and Jones traveled to Louisville, Kentucky in January 2019 to meet with Tierra to discuss the August 2018 opportunity with Stellantis and to strategize as to how the Company could best pursue and obtain the next opportunity.

70.     Unbeknownst to TBG, in or about the summer of 2021, Stellantis presented the Company with the Stellantis Opportunity, *i.e.*, the opportunity to participate in a "Pilot for Nation's First Black Supplier Development Program" launched by Stellantis and the National Business League.

71.     By freezing TBG out of the Company's day-to-day operations and denying it access to the Company's communications, the TKTA Fiduciaries purposely concealed from TBG the Stellantis Opportunity.

72.     Given the TKTA Fiduciaries' unlawful conduct, TBG learned for the first time of the Stellantis Opportunity and of the TKTA Fiduciaries' misappropriation of that Company opportunity through a Press Release issued by Stellantis on or about October 20, 2021. At that time, Stellantis announced that it and the National Business League had partnered to launch what they termed the "Nation's First Black Supplier Development Program" (the "Stellantis-NBL Program").

73.     The Stellantis Press Release announced that thirteen Black-owned businesses were selected to participate in the Stellantis-NBL Program, "which will run through the first quarter of 2022" and "is the initial phase of a larger program to develop Black suppliers for future contracting and procurement opportunities in pursuit of greater racial equity in the marketplace."

74.     The Press Release also announced that TKTA is one of the thirteen Black-owned businesses that will participate in the Stellantis-NBL Program.

75.     By its usurpation of the Stellantis Opportunity and its wrongful inclusion in the Stellantis-NBL Program, TKTA has taken for itself and at the expense of the Company the valuable opportunity to provide staffing and managed personnel services to Stellantis.

76.     TKTA, however, does not possess the experience, expertise and resources needed to provide managed personnel services on the scale required by Stellantis under the Stellantis-NBL Program.  Instead, TKTA traded off of the Company's goodwill, experience, and reputation to steal the Stellantis Opportunity.

77.     Indeed, the provision of managed personnel services required by the Stellantis Opportunity is the centerpiece of the Company's business; it has been providing such services to Toyota under the Agreement profitably for the last six years.

78.     At no time did TKTA ever seek permission or advise TBG that it was pursuing business opportunities with Stellantis separate, apart, and in conflict with the Company's efforts to pursue and obtain such opportunities.

79.     Accordingly, having stolen the Stellantis Opportunity and having kicked TBG to the curb, TKTA will be forced to recruit (if it has not done so already) the expertise needed to service the Stellantis Opportunity for its own account and to the unlawful exclusion of the Company and both of its Members.

VIII.   **The TKTA Fiduciaries Renew Their Unlawful Efforts to Expel TBG As a Member of the Company.**

80.     Following the cessation of the mediation, on October 25, 2021, the TKTA Fiduciaries sent letters to TBG and Rose falsely asserting that Rose had violated the TKTA Fiduciaries' unlawful and unenforceable edict that TBG refrain from communicating with Toyota.

18

That allegation is baseless; Rose had <u>not</u> communicated with anyone at Toyota concerning the Company's business.

81.     Like they did in the summer of 2021, the TKTA Fiduciaries purported to put TBG and Rose "on notice" of alleged "substantial deviations from [TBG's] duties to [the] Company under the Operating Agreement." The TKTA Fiduciaries accused Rose of "continu[ing] to interfere in [the] Company's relationship with Toyota … in direct contravention to the Management Committee's directive." The TKTA Fiduciaries asserted that Rose was "continuing to communicate with [the] Company's client, Toyota," thus allegedly "creating confusion and inconsistency for Toyota potentially harming [the] Company's relationship with Toyota." Significantly, the TKTA Fiduciaries did not identify and have never identified a single allegedly improper communication between Rose and any Toyota representative, and they have never detailed or explained how Rose was "creating confusion and inconsistency" with the Company's relationship with Toyota.

82.     Indeed, the exact opposite is true. While disputing and challenging the TKTA Fiduciaries' unlawful freeze-out campaign, TBG has complied with the dispute resolution provisions of the Operating Agreement, has done nothing to harm the Company's business relationships, and has categorically denied that it engaged in the communications as falsely alleged by the TKTA Fiduciaries. By letter dated November 4, 2021, TBG categorically denied that Rose had communicated with any employee of Toyota concerning any aspect of the Company's business relationship with Toyota. TBG, moreover, reiterated that Kavanaugh had no authority to issue the "Management Committee's directive" freezing TBG out of the Company's business operations and financial affairs. TBG also recounted that TBG in the summer of 2021 fully and completely addressed and cured the TKTA Fiduciaries' purported concerns about website content and email

signature blocks, and that TBG had not violated, and is not violating, any term of the Operating Agreement.

83.   TBG also put the TKTA Fiduciaries on notice that their actions in oppressing TBG constituted "continuing, substantial deviations" from the Operating Agreement that warranted TKTA's own termination as a Member of the Company.

84.   TBG thus demanded that Kavanaugh immediately restore TBG's access to all the Company's email accounts, domain, and servers, and that she cease her unlawful conduct in preventing TBG from participating in the Company's day-to-day operations and financial affairs. TBG also demanded disclosure of all emails and other correspondence concerning Stellantis and the renewal of the Toyota Contract.

85.   Rather than abandon their frivolous and malicious campaign to oppress TBG or to comply in good faith with TBG's reasonable demands as a 49% owner of the Company for access and information, the TKTA Fiduciaries doubled-down on their wrongful oppression and renewed their baseless attempt to expel TBG unlawfully from the Company.

86.   Rather than respond to TBG's November 4, 2021 demand, on November 18, 2021, the TKTA Fiduciaries served a Notice of Special Meeting to be Held on November 23, 2021 (the "Special Meeting"), with the stated purpose to "consider and act on: the removal, termination and cessation of TBG as a member of the Company."  (A copy of the Notice of Special Meeting is attached as *Exhibit B*.)  As further evidence of their malicious, wanton, and willful misconduct, the Agenda for the Special Meeting falsely declared that "TBG has failed to, refuses to, and is unable to, appropriately cure the continuing and substantial deviations [from its duties under the Operating Agreement]."

87.     As the record plainly shows, nothing could be further from the truth—TBG has not violated any of its duties under the Operating Agreement.

88.     Indeed, continuing their unlawful oppressive conduct, by separate letter dated November 18, 2021, the TKTA Fiduciaries refused to provide any information regarding Stellantis and the renewal of the Toyota Contract, and they failed to provide any evidence supporting their allegation that TBG had committed, or in any manner was committing, "continuing, substantial deviations" from its duties under the Operating Agreement. To date, the TKTA Fiduciaries have never disclosed to TBG any evidence that could support their bad-faith attempt to terminate TBG's 49% ownership interest in the Company.

89.     TBG thus commenced the Arbitration on November 19, 2021 to enforce its rights and pursue its remedies against the TKTA Fiduciaries given their continuing, material breaches of their duties under the Operating Agreement and applicable law.

IX.     **The TKTA Fiduciaries Held, Without Basis or Authorization, a Special Meeting of the Company's Members to Terminate TBG's Membership Interest.**

90.     Section 15.2 of the Operating Agreement provides that any disputes submitted to mediation pursuant to Section 15.1, but that were not resolved through mediation, must be submitted to binding arbitration before the AAA.

91.     As stated, in August 2021, TBG submitted to mediation, pursuant to Section 15.1, the dispute concerning TKTA's planned action to terminate TBG's membership interest in the Company upon a "finding of cause."

92.     After mediation did not achieve a settlement, on November 19, 2021, TBG submitted the parties' dispute, among others, to arbitration before the AAA by way of Demand for Arbitration and Complaint in Arbitration.

21

93.     Consequently, Section 15.2 of the Operating Agreement barred any further action that purported to terminate TBG's membership interest in the Company, which directed that the parties' dispute must be resolved in arbitration.

94.     Neither the Operating Agreement nor the pendency of the Arbitration deterred the TKTA Fiduciaries from continuing to pursue their unlawful objective of expelling TBG from the Company.

95.     By letter dated November 19, 2021, TBG served TKTA's counsel with TBG's Complaint in Arbitration and demanded that the purported Notice of Special Meeting, with its accompanying proposed Resolution terminating TBG's membership interest, be withdrawn because, among other reasons, the Company's Operating Agreement required the parties to arbitrate the existing and still unresolved dispute concerning whether the TKTA Fiduciaries could unilaterally and arbitrarily terminate TBG's membership interest.

96.     Alternatively, TBG demanded that the Special Meeting be adjourned for two additional reasons.  First, TBG asserted that the Meeting should proceed only after selection of an arbitrator and the arbitrator's adjudication of an appropriate application for injunctive relief to be brought by TBG to enjoin the Special Meeting.  Second, because Rose was then traveling abroad and unable to attend the Special Meeting as scheduled, and because the TKTA Fiduciaries had alleged that an undescribed and unsubstantiated "communicat[ion]" between Rose and an unidentified Toyota representative violated TKTA's unilateral and unenforceable edict that TBG cease communicating with Toyota and was asserting that alleged "communication" as a basis for TKTA's attempted termination of TBG's membership interest, TBG and Rose would be denied a full and fair opportunity to hear and to rebut any alleged "evidence" against them.

97.    Notwithstanding the unconscionable unfairness of proceeding without Rose, by email dated November 22, 2021, counsel for the TKTA Fiduciaries refused to withdraw the Notice of Special Meeting or to adjourn it.

98.    By letter of even date, TBG responded and again objected to the TKTA Fiduciaries' refusal to withdraw the Notice of Special Meeting or to adjourn it.  TBG specifically advised the TKTA Fiduciaries that the Special Meeting plainly violated the Operating Agreement because (i) TBG's Request for Mediation dated August 3, 2021, had expressly presented the dispute to mediation pursuant to Section 15.1, and (ii) Section 15.2 expressly mandated that the dispute be arbitrated if it were not resolved in mediation (which the dispute was not).  Moreover, TBG provided the TKTA Fiduciaries with a Supplemental Agenda for the Special Meeting that included the disclosure of:  (1) all information and evidence on which TKTA based its allegations of "cause" to terminate TBG's membership interest in the Company; (2) the status of the renewal of the Toyota Contract; (3) the status of the Stellantis Opportunity and the Stellantis-NBL Program; (4) the status of distributions made by the Company to its Members; and (5) a full and complete accounting of the Company's finances.

99.    The TKTA Fiduciaries refused to provide any of the information sought by TBG and proceeded with the Special Meeting on November 23, 2021, which was recorded stenographically and by video.  (A copy of the stenographic transcript of the Special Meeting is attached as *Exhibit C*.)

100.    At the sham Special Meeting, Kavanaugh and Bunton purported to take action pursuant to Section 12.2 of the Operating Agreement, which provided that "a Member's interest in the Company may be terminated immediately by the remaining Members upon a finding of cause for such termination."

101. Section 12.2 defined "cause" for termination to mean "… (vi) continuing, substantial deviations from duties after (X) written notice by the Company of the actions or omissions constituting alleged deviations and (Y) a reasonable period for the Member to cure such deviation."

102. During the Special Meeting, Kavanaugh, who presided over the Special Meeting as the Company's Manager and sole member of its Management Committee and attended as TKTA's representative, refused to recognize TBG's Supplemental Agenda. She then proceeded to recite the proposed Resolution that purported to terminate TBG's membership interest in the Company.

103. However, neither Kavanaugh nor Bunton presented any evidence in support of the Resolution. Indeed, no evidence has ever been produced. No finding of "cause" has ever been made as required by Section 12.2 of the Operating Agreement, and there is no basis for any such finding—no evidence has ever been presented showing that TBG committed "continuing, substantial deviations from duties" under the Operating Agreement that TBG failed to cure after notice and a reasonable time to do so.

104. During the brief time TBG was given to speak before Kavanaugh silenced it by improperly adjourning and then suddenly terminating the Special Meeting, TBG reiterated its objections to the Special Meeting and incorporated its November 22, 2021, letter into the record.

105. Specifically, TBG asserted as a threshold matter that there was no authority even to conduct the Special Meeting because the dispute over the propriety of TKTA's unlawful intention to terminate TBG's membership interest had been the subject of mediation and was then the subject of an extant arbitration proceeding and, accordingly, TKTA was prohibited by the Operating Agreement from taking any such action at a Special Meeting or otherwise.

106. Moreover, TBG asserted that it was TKTA's burden under Section 12.2 of the Operating Agreement to make a showing of "cause" and that the TKTA Fiduciaries had failed to produce any evidence or information to substantiate TKTA's allegations that TBG was committing "continuing, substantial deviations from [its] duties" under the Operating Agreement and had failed to cure them.  TBG again demanded, as it had many times prior to the Special Meeting, that the TKTA Fiduciaries disclose evidence in support of its scurrilous allegations.  Not only had the TKTA Fiduciaries failed to provide any such evidence prior to the Special Meeting, but they failed to present any such evidence during the Special Meeting, and Kavanaugh refused to answer any questions pertaining to the facts, if any, underlying TKTA's unsubstantiated contention that "cause" existed to terminate TBG's membership interest.

107. To compound TKTA's failure and inability to produce evidence to justify the unlawful termination of TBG's membership interest, Kavanaugh purported to "vote" on an improperly presented motion to terminate TBG's membership interest that had not been seconded and without allowing TBG to conclude its remarks on the proposed Resolution.

108. The TKTA Fiduciaries' conduct during the sham Special Meeting made clear its unlawful, malicious intent to expel TBG without regard for their obligations under the Operating Agreement or applicable law, and in the absence of the proof required to justify the extraordinary action of stripping TBG of its valuable membership interest.

109. Following the so-called Special Meeting, the TKTA Fiduciaries failed to distribute any Resolution reflecting any Company action, including that the proposed unlawful action had, in fact, been taken.  TBG thus reasonably understood that the TKTA Fiduciaries had reconsidered their unlawful action and would, as required by the Operating Agreement, submit the matter to binding arbitration.

110.    On December 7, 2021, TKTA filed an Answering Statement to TBG's Complaint in Arbitration, in which it denied TBG's allegations that TBG was a 49% member in the Company and that TKTA was a 51% member.  Those denials, notwithstanding TKTA's conspicuous silence, suggested that a formal Resolution might have been adopted terminating TBG's membership interest in the Company.  But TKTA had still not served such a Resolution on TBG.

111.    By letter dated December 8, 2021, TBG reasserted the numerous procedural and substantive infirmities that negate the Special Meeting and the *ultra vires* acts purportedly taken during it, and demanded that if the TKTA Fiduciaries had, in fact, formalized those unlawful actions through a Company Resolution, that it be immediately provided to TBG.

112.    The next day, December 9, 2021, TKTA provided TBG with "Meeting Minutes" for the Special Meeting conducted on November 23, 2021, and a Resolution of the Company signed by Kavanaugh on behalf of TKTA through which TKTA purported to (1) terminate TBG's membership interest in the Company pursuant to Section 12.2 of the Operating Agreement for alleged "cause," *i.e.*, an alleged failure to cure alleged "continuing and substantial deviations from [TBG's] duties under the Operating Agreement"; (2) declare TKTA as the sole Member of the Company; (3) terminate TBG's right to distributions from the Company; and (4) direct Kavanaugh, as the Company's "Management Committee," to determine the "purchase price" for TBG's membership interest pursuant to Section 12.3 of the Operating Agreement.  (A copy of the Meeting Minutes and the Resolution are attached as *Exhibit D*.)

113.    Notwithstanding the prior commencement of mediation and the pendency of the Arbitration, and without a shred of evidence or authority under the Operating Agreement or applicable law to validate their oppressive conduct, the TKTA Fiduciaries have purported to effectuate the *ultra vires*, void action taken by them at the bogus Special Meeting to misappropriate

TBG's 49% membership interest by noticing the commencement of the process for determining the purported "purchase price" for that interest.

114.    TBG brings this action against Kavanaugh and Bunton to halt and obtain all necessary and appropriate relief for their breaches of fiduciary duties and other unlawful conduct.

## COUNT I
### (Breach of Fiduciary Duties)

115.    TBG repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth here.

116.    At all relevant times, TBG was a Member of the Company owning a 49% membership interest.

117.    At all relevant times, Kavanaugh served as TKTA's Chief Executive Officer and/or President and its sole Director.

118.    Kavanaugh has served as the Company's Manager and sole member of its Management Committee since at least August 2020.

119.     Kavanaugh nominally exercised control over the Company as its Manager and sole member of its Management Committee.

120.    At all relevant times, TKTA was a Member of the Company owning a 51% membership interest.

121.    As an officer and director of TKTA, Kavanaugh exercised control over TKTA's business affairs and benefitted from TKTA's actions.

122.    At all relevant times, Bunton served as President of TKTA.

123.    As an officer of TKTA, Bunton exercised control over TKTA's affairs and benefitted from TKTA's actions.

124.    Kavanaugh owed a duty of loyalty to the Company and its Members that required her, among other things, to hold as trustee for the Company any property, profit, opportunity, or benefit derived in the conduct of the Company's business or the use of the Company's property.

125.    Kavanaugh's duty of care required her, among other things, to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

126.    As the Company's majority Member, TKTA owed TBG fiduciary duties, including the duties of loyalty, care, and good faith.

127.    TKTA's duty of loyalty required it, among other things, to hold as trustee any property, profit, opportunity, or benefit derived in the conduct of the Company's business or the use of the Company's property.

128.    TKTA's duty of care required it, among other things, to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

129.    The fiduciary duties that TKTA owed the Company and its Members extended to Kavanaugh and Bunton as TKTA's officers.

130.    Kavanaugh and Bunton breached fiduciary duties each owed to TBG by, among other acts and omissions, knowingly and intentionally

   i.  conspiring to freeze-out and drive TBG out of the Company through coerced buyout or otherwise;

   ii.  removing TBG's access to the Company's email accounts, domain, and servers;

   iii.  prohibiting TBG from continuing to participate in the management of the Company's business and operations as it had since the formation of the Company;

   iv.  noticing and presiding over a sham, *ultra vires* Special Meeting notwithstanding a plain lack of authority under the Operating Agreement and the pendency of the Arbitration;

     v.        purporting to terminate TBG's membership interest in the Company by the contrived, pretextual bases described above; and

     vi.      purporting to commence the process to determine the "purchase price" for TBG's membership interest, which the TKTA Fiduciaries have unlawfully misappropriated.

131.    Kavanaugh noticed and presided over the sham Special Meeting and caused the Company to terminate TBG's membership interest by the fabricated pretextual bases described above.  She signed the Notice of the Special Meeting as Manager and the sole member of the Management Committee of the Company, declaring "This constitutes notice from the Management Committee to the members as of November 18, 2021," of the intention "to consider and act on: the removal, termination and cessation of TBG as a member of the Company."

132.    Prior to the bogus Special Meeting, Kavanaugh and Bunton failed to identify any alleged unauthorized conduct or to afford TBG with a reasonable period to cure any alleged "continuing, substantial deviations from duties" allegedly committed by TBG that allegedly constituted "cause" under Section 12.2 to terminate TBG's membership interest in the Company.

133.    During the Special Meeting, Kavanaugh called the Special Meeting to order and improperly moved the Resolution for discussion.  Kavanaugh and Bunton failed to present any evidence supporting the claim or to establish "cause" that could warrant termination of TBG's membership interest in the Company under Section 12.2.

134.    Undeterred by TBG's objections and the absence of any evidence, Kavanaugh nevertheless improperly called a vote on the proposed, unauthorized and unsubstantiated Resolution to terminate TBG's membership interest.

135.    While unclear, it appears that Kavanaugh, without permitting any substantive discussion and without introducing any evidence of wrongdoing, then cast a vote on behalf of TKTA in favor of the sham, *ultra vires* Resolution.

136.    Notwithstanding the pendency of the Arbitration, Kavanaugh's and Bunton's breaches of fiduciary duties are continuing and on-going, as Kavanaugh and Bunton have purported to commence the process, to be effectuated by Kavanaugh as Manager and sole member of the Management Committee, to determine the "purchase price" for TBG's membership interest, which they have purported to unlawfully terminate.

137.    Kavanaugh's and Bunton's breaches of fiduciary duties of loyalty, care, and good faith each owed to TBG have caused TBG to suffer damages in an amount to be determined at trial.

## COUNT II
### (Aiding and Abetting Breaches of Fiduciary Duties)

138.    TBG repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth here.

139.    Kavanaugh and Bunton each owed fiduciary duties to the Company and its Members.

140.    Kavanaugh and Bunton, acting individually and in concert with one another, aided and abetted the breach of fiduciary duties each owed to TBG by, among other acts and omissions, knowingly and intentionally

    i.     removing TBG's access to the Company's email accounts, domain, and servers;

    ii.    prohibiting TBG from continuing to participate in the management of the Company's business and operations as it had since the formation of the Company;

    iii.   noticing and presiding over a sham, *ultra vires* Special Meeting notwithstanding a plain lack of authority under the Operating Agreement and the pendency of the Arbitration;

    iv.   purporting to terminate TBG's membership interest in the Company by the contrived, pretextual bases described above; and

      v.        purporting to effectuate the process to determine the "purchase price" for TBG's membership interest, which the TKTA Fiduciaries have unlawfully misappropriated.

141.    Kavanaugh and Bunton knew that each owed fiduciary duties, and they actively and substantially assisted each other in breaching their respective fiduciary duties.

142.    Kavanaugh's and Bunton's conduct has caused TBG to suffer damages in an amount to be determined at trial.

## COUNT III
### (Tortious Interference with Contract)

143.    TBG repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth here.

144.    At all relevant times, TBG was a Member of the Company owning a 49% membership interest.

145.    Section 12.2 of the Operating Agreement provides that a Member's interest in the Company may be terminated only upon a finding of "cause for such termination."

146.    Section 12.2 defines "cause" to mean "… (vi) continuing, substantial deviations from duties after (X) written notice by the Company of the actions or omissions constituting alleged deviations and (Y) a reasonable period for the Member to cure such deviation."

147.    TKTA breached the express terms of Section 12.2 of the Operating Agreement by, among other things, purporting to terminate TBG's membership interest in the Company by the contrived, pretextual bases described above.

148.    Among other things, TKTA failed to identify or give proper notice of—much less prove—any alleged "continuing, substantial deviations from duties" committed by TBG that allegedly established "cause" under Section 12.2 to terminate TBG's membership interest in the Company.

149.    TKTA, moreover, failed to provide TBG with a reasonable period to cure any alleged "continuing, substantial deviations from duties" allegedly committed by TBG that allegedly gave TKTA "cause" under Section 12.2 to terminate TBG's membership interest in the Company.

150.    TKTA presented no evidence at the Special Meeting upon which a finding of "cause" could be based or sustained, but brazenly purported to terminate TBG's membership interest in the Company.

151.    Section 15.2 of the Operating Agreement provides that any disputes submitted to mediation pursuant to Section 15.1, but that were not resolved through mediation, must be submitted to binding arbitration before the AAA.

152.    TBG submitted the parties' dispute to mediation in the summer of 2021.

153.    On November 19, 2021, upon the unsuccessful conclusion of mediation, TBG submitted the dispute, among others, to arbitration before the AAA by way of Demand for Arbitration and Complaint in Arbitration.

154.    Section 15.2 barred TKTA from taking any further action that purported to terminate TBG's membership interest in the Company.

155.    Ignoring TBG's objections, TKTA held the Special Meeting in violation of Section 15.2.

156.    TKTA's breaches of Section 12.2 and Section 15.2 of the Operating Agreement have caused TBG to suffer continuing, immediate and irreparable harm and monetary damages in an amount to be determined.

157.    At all relevant times, Kavanaugh served as TKTA's Chief Executive Officer and/or President and its sole Director.

158.    As an officer and director of TKTA, Kavanaugh nominally exercised control over TKTA's business affairs and benefitted from TKTA's actions.

159.    At all relevant times, Bunton served as President of TKTA.

160.    As an officer of TKTA, Bunton exercised control over TKTA's affairs and benefitted from TKTA's actions.

161.    Kavanaugh and Bunton, acting maliciously and in bad faith, purposefully caused TKTA to oppress TBG and to violate the Operating Agreement.

162.    Kavanaugh and Bunton intended that TKTA breach Sections 12.2 and 15.2 of the Operating Agreement.

163.    Kavanaugh and Bunton caused TKTA to breach Sections 12.2 and 15.2 of the Operating Agreement.

164.    Kavanaugh's and Bunton's conduct was intentional, wanton, willful, and malicious.

165.    There was no privilege or justification to excuse Kavanaugh's and Bunton's conduct.

166.    Kavanaugh's and Bunton's conduct has caused TBG to suffer damages in an amount to be determined at trial.

## COUNT IV
### (Tortious Interference with Contract)

167.    TBG repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth here.

168.    At all relevant times, TBG was a Member of the Company owning a 49% membership interest.

169.    Although the Company's Management Committee is generally responsible for managing the Company's business, the following provisions set forth in Section 9 of the Operating Agreement made TBG and TKTA *jointly* responsible for the Company's marketing, advertising, sales, and operational activities.

170.    Section 9.1 obligates TKTA and TBG to jointly develop marketing and advertising strategies, develop budgets, produce marketing materials, and formulate sales presentations.

171.    Section 9.2.1 obligates TKTA and TBG to "jointly develop sales strategies and client target lists and cooperate in scheduling and performing demonstrations of [the Company] to clients."  To that end, TKTA and TBG are required to "regularly provide reports to the other party on sales activities, potential clients, sales calls and results."

172.    Section 9.2.2 provides TBG with "the opportunity and the right to market and generate new clients for [the Company]."  TBG was required to "use its best efforts to communicate all sales targets and activities" to TKTA.

173.    Section 9.2.2(c) provides that TKTA and TBG would "equally share responsibilities for executing sales, marketing and public relations strategies."  Each is obligated to, "in good faith, work toward the successful development and marketing of [the Company], including full and complete communication of any and all factors that impact the potential success of marketing to clients."

174.    Section 9.3 renders TKTA and TBG jointly "responsible for operational activities for [the Company]," and each is required to "exercise good faith in maintaining the credibility of all services at the highest possible level for achieving client satisfaction."  TKTA and TBG "share responsibilities for analyzing potential problems and issues relating to [the Company's] clients as needed."

175.    And Section 6.4 provides that "[on] reasonable request, each member must give the other Members a true accounting of all transactions relating to the business of the Company, and full information of all letters, accounts, writings, and other things which come to its knowledge concerning the business of the Company."

176.    TKTA breached the express terms of the Operating Agreement by, among other things, removing TBG's access to the Company's email accounts, domain, and servers, and prohibiting TBG from continuing to participate in the management of the Company's business and operations as it had since the formation of the Company.

177.    TKTA's breaches of Sections 9 and 6.4 of the Operating Agreement have caused TBG to suffer continuing, immediate and irreparable harm and monetary damages in an amount to be determined.

178.    At all relevant times, Kavanaugh served as TKTA's Chief Executive Officer and/or President and its sole Director.

179.    As an officer and director of TKTA, Kavanaugh nominally exercised control over TKTA's business affairs and benefitted from TKTA's actions.

180.    At all relevant times, Bunton served as President of TKTA.

181.    As an officer of TKTA, Bunton exercised control over TKTA's affairs and benefitted from TKTA's actions.

182.    Kavanaugh and Bunton, acting maliciously and in bad faith, purposefully caused TKTA to oppress TBG and to violate the Operating Agreement.

183.    Kavanaugh and Bunton intended that TKTA breach Sections 9 and 6.4 of the Operating Agreement.

184.    Kavanaugh and Bunton caused TKTA to breach Sections 9 and 6.4 of the Operating Agreement.

185.    Kavanaugh's and Bunton's conduct was intentional, wanton, willful, and malicious.

186.    There was no privilege or justification to excuse Kavanaugh's and Bunton's conduct.

187.    Kavanaugh's and Bunton's conduct has caused TBG to suffer damages in an amount to be determined at trial.

## COUNT V
### (Tortious Interference with Contract)

188.    TBG repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth here.

189.    At all relevant times, TBG was a Member of the Company owning a 49% membership interest.

190.    Section 6.1 prohibits any Member from pursuing or becoming directly or indirectly interested in any business that competes with the business conducted by the Company.

191.    The Stellantis Opportunity and the Stellantis-NBL Program concern the provision of managed personnel and other services that the Company provides in the ordinary course of its business.

192.    At all relevant times, the Company was able to avail itself of the Stellantis Opportunity and participate in the Stellantis-NBL Program.

193.    By pursuing and converting the Stellantis Opportunity and by participating in the Stellantis-NBL Program, TKTA competed, and is competing, directly with the business conducted by the Company.

194.    TKTA breached Section 6.1 of the Operating Agreement by, among other things, usurping and misappropriating the Stellantis Opportunity for its own benefit and to the detriment of the Company and its Members, and participating in the Stellantis-NBL Program.

195.    TKTA's breaches of Section 6.1 of the Operating Agreement have caused TBG to suffer continuing, immediate and irreparable harm and monetary damages in an amount to be determined.

196.    At all relevant times, Kavanaugh served as TKTA's Chief Executive Officer and/or President and its sole Director.

197.    As an officer and director of TKTA, Kavanaugh nominally exercised control over TKTA's business affairs and benefitted from TKTA's actions.

198.    At all relevant times, Bunton served as President of TKTA.

199.    As an officer of TKTA, Bunton exercised control over TKTA's affairs and benefitted from TKTA's actions.

200.    Kavanaugh and Bunton, acting maliciously and in bad faith, purposefully caused TKTA to oppress TBG and to violate the Operating Agreement.

201.    Kavanaugh and Bunton intended that TKTA breach Section 6.1 of the Operating Agreement.

202.    Kavanaugh and Bunton caused TKTA to breach Section 6.1 of the Operating Agreement.

203.    Kavanaugh's and Bunton's conduct was intentional, wanton, willful, and malicious.

204.    There was no privilege or justification to excuse Kavanaugh's and Bunton's conduct.

205.    Kavanaugh's and Bunton's conduct has caused TBG to suffer damages in an amount to be determined at trial.

## COUNT VI
### (Tortious Interference with Business Relations)

206.    TBG repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth here.

207.    At all relevant times, TBG was a Member of the Company owning a 49% membership interest.

208.    Prior to engaging in the unlawful oppressive conduct described above, Kavanaugh and Bunton were fully aware that the Company had pursued, and was continuing to pursue, a business relationship with Stellantis for the provision of managed personnel and other services.

209.    Kavanaugh and Bunton were fully aware that the services sought by Stellantis pursuant to the Stellantis Opportunity were services ordinarily provided by the Company in the course of its business and that the Company was willing and able to provide them to Stellantis.

210.    Kavanaugh and Bunton knowingly interfered with the Company's expectation of a business relationship with Stellantis through numerous overt acts intended to usurp and misappropriate the Stellantis Opportunity.

211.    Kavanaugh and Bunton knowingly interfered with the Company's expectation of a business relationship with Stellantis for the improper purpose of, among other things, usurping and misappropriating the Stellantis Opportunity and denying TBG the financial and other benefits of participation in the Stellantis-NBL Program.

212.    Kavanaugh's and Bunton's knowing and improper interference with the Company's expectation of a business relationship with Stellantis caused the Stellantis Opportunity to be taken by TKTA rather than the Company.

213.    Kavanaugh's and Bunton's conduct was intentional, wanton, willful, and malicious.

214.    Kavanaugh's and Bunton's knowing and improper interference with the Company's expectation of a business relationship with Stellantis has caused TBG to suffer damages in an amount to be determined at trial.

## COUNT VII
### (Conversion)

215.    TBG repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth here.

216.    At all relevant times, TBG was a Member of the Company owning a 49% membership interest.

217.    At all relevant times, TBG had the rights to possess and enjoy a 49% membership interest in the Company.

218.    Kavanaugh and Bunton exercised unlawful dominion over TBG's membership interest by noticing and taking action at the sham Special Meeting to purportedly terminate TBG's membership interest, and through the Resolution that purported to formalize their actions.

219.    Through their actions, Kavanaugh and Bunton have purported to terminate TBG's rights as a member of the Company, including the right to receive cash distributions.

220.    Kavanaugh's and Bunton's actions were intentional, willful, wanton, and malicious.

221.    TBG repeatedly demanded that Kavanaugh and Bunton refrain from taking any action to attempt to terminate TBG's membership interest in the Company, and Kavanaugh and Bunton refused to do so.

222.    Kavanaugh's and Bunton's conduct nominally has caused the termination and loss of TBG's valuable membership interest in the Company.

223.    As a result of Kavanaugh's and Bunton's conduct and the unlawful termination and conversion of TBG's membership interest, TBG has suffered damages in an amount to be determined at trial.

## COUNT VIII
### (Civil Conspiracy)

224.    TBG repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth here.

225.    At all relevant times, TBG was a Member of the Company owning a 49% membership interest.

226.    Each of the TKTA Fiduciaries acted individually and in concert to commit the unlawful acts alleged above or to commit a lawful act by the unlawful means alleged above.

227.    Each of the TKTA Fiduciaries undertook to inflict a wrong against or an injury upon TBG through the unlawful freeze-out campaign and expulsion of TBG as a Member of the Company and the usurpation and misappropriation of the Stellantis Opportunity.

228.    The TKTA Fiduciaries committed numerous overt acts that caused damage to TBG including, but not limited to, all acts necessary and attendant to the freeze-out campaign and ultimate expulsion of TBG as a Member, and usurpation and misappropriation of the Stellantis Opportunity, and TKTA's wrongful participation in the Stellantis-NBL Program.

229.    Each of the TKTA Fiduciaries understood the general objectives of their unlawful oppression scheme.

230.    At all relevant times, each of the TKTA Fiduciaries acted voluntarily, intentionally, wantonly, and in willful disregard for TBG's rights and without legal justification or excuse.

231.    The TKTA Fiduciaries' conduct was intentional, wanton, willful, malicious, and outrageous.

232.    Kavanaugh's and Bunton's conduct has caused TBG to suffer damages in an amount to be determined at trial.

## COUNT IX
### (Declaratory Judgment)

233.    TBG repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth here.

234.    At all relevant times, TBG was a Member of the Company owning a 49% membership interest.

235.    At all relevant times, Kavanaugh acted as the Company's Manager and as sole member of the Company's Management Committee.

236.    Section 4.5.4 of the Operating Agreement provides in relevant part,

> Unless otherwise prohibited by law, the Company shall indemnify and hold harmless the Members of the Management Committee, the Members, their respective agents, officers, directors, and employees, the Company's officers and the respective successors of all such Persons (individually, an "Indemnitee") from any claim, loss, expense, liability, action or damage resulting from any act or omission performed by or on behalf of or omitted by the Indemnitee in its capacity as a Member of the Management Committee or a Member or an officer, including, without limitation, reasonable costs and expenses of its attorneys engaged in the defense of any such act or omission; provided, however, that the Indemnitee shall not be indemnified or held harmless for any act or omission that is in violation of any of the provisions of this Agreement or that constitutes fraud, gross negligence or willful misconduct.

237.    TBG contends that Kavanaugh's conduct violated the terms of the Operating Agreement and/or was fraudulent, grossly negligent, or willful misconduct.

238.    TBG reasonably expects Kavanaugh to assert rights to indemnification pursuant to Section 4.5.4 of the Operating Agreement in connection with her conduct as alleged herein.

239.     Pursuant to <u>KRS § 418.040</u>, "In any action in a court of record of this Commonwealth having general jurisdiction wherein it is made to appear that an actual controversy exists, the plaintiff may ask for a declaration of rights, either alone or with other relief; and the court may make a binding declaration of rights, whether or not consequential relief is or could be asked."

240.     Accordingly, an actual controversy has arisen and now exists between TBG and Kavanaugh concerning whether Kavanaugh is entitled to indemnification pursuant to Section 4.5.4 of the Operating Agreement.

241.     A judicial declaration is necessary and appropriate to conclusively adjudicate Kavanaugh's rights.

**COUNT X**
**(Punitive Damages)**

242.     TBG repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth here.

243.     The actions of Kavanaugh and Bunton, as set forth above, were taken maliciously, in bad faith, and in purposeful disregard for the rights of TBG thereby constituting sufficient grounds for an award of punitive damages.

**COUNT XI**
**(Temporary and Permanent Injunctive Relief)**

244.     TBG repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth here.

245.     The unlawful actions of Kavanaugh and Bunton, as set forth above, have caused, and will continue to cause, irreparable harm to TBG's rights as a Member of the Company by, among other things: (1) terminating, without basis and in violation of Sections 12.2 and 15.2 of the Operating Agreement, TBG's  membership interest; (2) proceeding with a valuation of TBG's

42

membership interest in violation of Section 12.3 of the Operating Agreement; and (3) depriving TBG of access to the Company's email accounts, domain and server, and creating and maintaining barriers to TBG's customary and ordinary participation in the Company's financial affairs and business operations, in violation of Sections 6.4 and 9 of the Operating Agreement.

246.    The improper actions of Kavanaugh and Bunton, as set forth above, will continue unabated unless and until temporary and permanent injunctive relief is granted, ordering Kavanaugh and Bunton to cease their unlawful activities.

**WHEREFORE**, Plaintiff Brunswick TKTKonnect, LLC demands that a judgment and award be entered against Defendants Sheila P. Kavanaugh and Kimberly Bunton:

a.  Granting immediate, preliminary, and permanent injunctive relief enjoining Kavanaugh and Bunton from taking any other action that may have the effect of interfering in any manner with TBG's rights as a Member of the Company, including but not limited to proceeding with a valuation of TBG's membership interest pursuant to Section 12.3 of the Operating Agreement;

b.  Granting immediate, preliminary, and permanent injunctive relief directing Kavanaugh and Bunton to restore all of TBG's rights as a Member of the Company, including but not limited to, restoring TBG's access to the Company's email accounts, domain and server and restoring the status quo by removing any and all barriers to TBG's customary and ordinary participation in the Company's day-to-day business affairs and operations;

c.  Declaring the actions taken at the Special Meeting to be *ultra vires*, void, null, and of no legal effect;

d.  Declaring TBG to be a Member of the Company owning a 49% membership interest;

e.  Disgorging all distributions, profits, and economic benefits received by Kavanaugh and Bunton in relation to or arising out of their conduct as alleged herein;

f.  Declaring that Kavanaugh is not entitled to indemnification pursuant to Section 4.5.4 of the Operating Agreement;

g.  Ordering Kavanaugh to disgorge all attorney's fees and other costs paid by the Company in relation to or arising out of her conduct as alleged herein;

h.  Awarding compensatory damages;

i.  Awarding punitive damages;

j.   Awarding pre- and post-judgment interest;

k.   Awarding attorney's fees and costs pursuant to Section 16.8 of the Operating Agreement and for Kavanaugh's and Bunton's bad-faith pre-litigation conduct; and

l.   Granting such other relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff Brunswick TKTKonnect, LLC requests a jury trial on all issues so triable.

Respectfully submitted,

*/s/ Cornelius E. Coryell, II*
   Cornelius E. Coryell, II

**WYATT, TARRANT & COMBS**
400 West Market Street, Suite 2000
Louisville, Kentucky 40202

-and-

Kenneth L. Moskowitz (*pro hac vice* to be filed)
Anthony M. Gruppuso  (*pro hac vice* to be filed)
**BROWN MOSKOWITZ & KALLEN, P.C.**
One Main Street
Chatham, New Jersey 07928

*Attorneys for Plaintiff Brunswick TKTKonnect, LLC*

100675082.1