## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION
## CIVIL ACTION NO. 3:22-CV-00004-RGJ-CHL

BRUNSWICK TKTKONNECT, LLC,                                    **Plaintiff,**

**v.**

SHEILA P. KAVANAUGH, et al.,                                 **Defendants.**

### MEMORANDUM OPINION & ORDER

Before the Court are two Motions to Quash. Movant TKTKonnect, LLC ("Konnect") has

filed a Motion to Quash Subpoenas. (DN 63.) Movant TKT & Associates, Inc. ("TKTA") has

filed a Motion to Quash Subpoena to Stellantis. (DN 65.) Plaintiff has filed a response to both

Motions. (DNs 74, 75.) Accordingly, both Motions are ripe. For the reasons stated below, both

Motions are **DENIED**.

**I.      Background**

      **A.      Factual Background[1]**

           **1.      Plaintiff and TKTA form Konnect.**

As with many other industries, the automobile industry makes use of an outsourced,

subcontracted, and tiered supply chain model to purchase direct and indirect goods and services.

(DN 47 at ¶ 16.) This model includes Original Equipment Manufacturers ("OEMs"), suppliers

that contract directly with OEMs ("Tier 1s"), and subcontractors that supply Tier 1s ("Tier 2s").

(*Id*. at ¶ 20.) Automobile companies often rely on a managed-services provider ("MSP") to

manage its spending on these goods and services. (*Id*. at ¶ 16.) Companies like Toyota and

---

[1] The Court has drawn the following factual findings from the pleadings in the case.

Stellantis often use MSPs to promote diversity for women and minority-owned businesses like Konnect. (*Id.*)

TKTA is a Kentucky corporation that was founded by Tierra Kavanaugh Wayne, and Plaintiff is a New Jersey LLC that was founded by Michael Rose and Randy Jones. (DN 142, at PageID # 142.) Defendants Sheila P. Kavanaugh and Kimberly Bunton ("Defendants") are officers of TKTA. (DN 47 at ¶ 1.) In 2015, TKTA and Plaintiff signed an Operating Agreement to form Konnect, an LLC that started as an MSP in the staffing industry. (*Id.* at ¶ 19.) As a manager-managed LLC, a management committee manages Konnect's business. (*Id.* at ¶ 24.) In the beginning, Konnect's members appointed Wayne as the sole representative of the management committee. (*Id.*)

Konnect's business began with the Master Personnel Services Agreement with Toyota in 2016 ("Toyota Contract"). (DN 47 at ¶ 21.) The Toyota Contract was for four years, with automatic renewal for an additional two years. (*Id.*) Under the Toyota Contract, Konnect provided managed personnel services to Toyota. (*Id.* at ¶ 22.) Plaintiff expected that by the time the Toyota Contract expired in 2022, Konnect would renew its contract with Toyota, and that the contract would expand in scope and value. (*Id.* at ¶ 23.) Plaintiff's expertise in managed personnel service was important in acquiring the Toyota Contract, but Vignetic, an affiliate of Plaintiff, provided information technology, back-office accounting, project management, and workforce-managed services to Konnect as a sub-contractor. (*Id.* at ¶ 33.)

### 2.    Konnect pursues a contract with Stellantis.

In 2017, Stellantis grew interested in Konnect due to its track record with Toyota. (DN 47 at ¶ 66.) As such, Rose, Jones, and Wayne traveled to Texas in June of 2018 on behalf of Konnect to meet with representatives of Stellantis to market its services to Stellantis. (*Id.* at ¶ 67.) Later,

in August of 2018, Stellantis issued a request for information for MSP services to Konnect.  (*Id.* at ¶ 68.)  Konnect delivered a response to Stellantis later that month.  (*Id*. at ¶ 72.)  Despite this, Stellantis and Konnect did not enter a contract.  (*Id*. at ¶ 75.)  Nevertheless, Konnect continued to communicate with Stellantis about a potential business relationship.  (*Id*.)  Rose, Jones, and Wayne met in Louisville, in January of 2019, to strategize as to how Konnect could best obtain the next opportunity with Stellantis.  (*Id*.)

To secure the contract with Stellantis, Konnect began to broaden its client offerings to include media buys, as this would be far more profitable than managing staffing services alone.  (DN 47 at ¶ 76-7.)  Konnect pursued this goal by improving its technology platform to accommodate an extended suite of indirect spend management services.  (*Id*. at ¶ 78.)  Konnect then made various presentations to Stellantis outlining its client offerings.  (*Id.* at ¶ 84.)  In addition to this prospective contract with Stellantis, Konnect sought to offer media buy capabilities to Toyota as well.  (*Id*. at ¶ 87.)

### 3.    The relationship between Plaintiff and TKTA begins to sour.

Wayne passed away in 2020, and her mother, Kavanaugh, succeeded her as President of TKTA.  (DN 17-1, at PageID # 142.)  Kavanaugh would later become the CEO of TKTA, with Bunton becoming President.  (*Id*.)  Konnect's members then elected Kavanaugh as the sole representative of the Management Committee.  (*Id*.)

In 2021, another company named Integrity MSP approached Plaintiff to inquire about purchasing its 49% ownership interest in Konnect.  Plaintiff had no intention of selling its membership interest to anyone, and so informed TKTA of Integrity MSP's inquiry.  (DN 47 at ¶ 37.)  Integrity MSP then abruptly informed Plaintiff that it no longer intended to purchase Plaintiff's interest in Konnect.  (*Id*.)

However, Plaintiff learned that Bunton had been communicating with Integrity MSP concerning a potential business relationship between Integrity MSP and Konnect.  (DN 47 at ¶ 37.) Integrity MSP forecasted that its information technology could be an asset to Konnect.  (*Id.*) Plaintiff's principals asked if they could view Integrity MSP's product, but neither Integrity MSP nor TKTA showed them the product.  (*Id.*)

Later that year, Bunton told Rose and Jones that she and Kavanaugh were visiting New York City and invited them out to dinner.  (DN 47 at ¶ 38.)  When the four met, Bunton told Rose and Jones that they had violated Konnect's Operating Agreement by misrepresenting to others that Vignetic was a member of Konnect.  (*Id.*)  Bunton told Rose and Jones that they wanted Konnect to sell Plaintiff's interest in the company, even though Plaintiff had no plans to sell its interest. (*Id.*)

After this meeting, Konnect sent three letters to Plaintiff.  (DN 47 at ¶ 40.)  The first letter was written by Konnect's outside counsel, and in the letter counsel alleged Plaintiff committed substantial deviations from its duties under the Operating Agreement by using intentionally confusing email addresses and signature blocks in emails with Toyota; by soliciting and responding to requests for proposals related to Toyota on behalf of another entity; by permitting Vignetic to post inaccurate information about Konnect on its website; and by allowing Vignetic to send out marketing information to Konnect's vendors and suppliers.  (*Id.*)  Konnect told Plaintiff that if it failed to cure the alleged breaches, Konnect would hold a special meeting to expel Plaintiff from Konnect.  (*Id.* at ¶ 41.)  The second letter was also written by outside counsel, and in the letter, counsel accused Vignetic of misrepresenting its relationship with Konnect through content on its website describing Konnect as a "joint venture" with Vignetic.  (*Id.* at ¶ 43.)  The third letter was written by Kavanaugh, and in the letter, she told Plaintiff's principals that she would be

appointing different individuals as "client relationship managers" between Konnect and Toyota. (*Id*. at ¶ 46.)  Kavanaugh further prohibited Plaintiff's principals from having any direct contact with any representative of Toyota, its affiliated entities, or contractors on behalf of Konnect.  (*Id*. at ¶ 47.)  Finally, Kavanaugh denied Plaintiff's principals access to Konnect's email addresses, domain, and servers.  (*Id*. at ¶ 48.)

### 4.    TKTA informs Plaintiff that it intends to terminate its membership from Konnect.

Plaintiff and Vignetic both took immediate action to make the requested changes to Vignetic's website.  (DN 47 at ¶ 56.)  Konnect then insisted that Plaintiff send an email to Toyota to clarify any potential misunderstanding, but Plaintiff was concerned that such an email would likely confuse Toyota more than clarify any misunderstanding.  (*Id*. at ¶ 62.)  Plaintiff had also discovered that Konnect secured a loan with a third party, allegedly for the benefit of TKTA. Plaintiff demanded more information about this loan from Konnect, but TKTA provided Plaintiff with no information.  (*Id*. at ¶ 63.)

Plaintiff sought to resolve its dispute with TKTA through mediation, and the two entities scheduled a mediation session for September 10, 2024.  (DN 47 at ¶ 65.)  This session continued through October 5, 2021, but the two could not come to an agreement.  (*Id*.)

Unknown to Plaintiff, Stellantis had presented Konnect with an opportunity to participate in a "Pilot for Nation's First Black Supplier Development Program" launched by Stellantis and the National Business League ("Stellantis Opportunity").  (DN 47 at ¶ 89.)  Plaintiff learned about this, for the first time, in a press release issued by Stellantis in October of 2021.  (*Id*. at ¶ 91.)  But instead of Konnect obtaining the opportunity, it was TKTA instead that managed to join the Stellantis – NBL Program.  (*Id*. at ¶ 93.)

After TKTA joined the Stellantis – NBL Program, Defendants sent letters to Plaintiff asserting that Rose had violated their instructions not to communicate with Toyota. (DN 47 at ¶ 99.) Plaintiff then responded by denying all of Defendants' allegations and demanded that Kavanaugh restore Plaintiff's access to all Konnect's email accounts, domain, and servers. (*Id*. at ¶¶ 101-103.) Instead of responding, Defendants served a notice of special meeting for the purpose of terminating Plaintiff's interest in Konnect. (*Id*. at ¶ 105.)

**B.    Procedural History**

**1.    Plaintiff submits this dispute to arbitration and TKTA votes to terminate Plaintiff's interest in Konnect.**

After Plaintiff received notice of the special meeting, it submitted this dispute to Arbitration. (DN 47 at ¶ 111.) Pursuant to the Operating Agreement, Plaintiff requested that Defendants cancel the special meeting to terminate Plaintiff's interest pending the result of arbitration. (*Id*. at ¶ 114.) Defendants refused to do so, and instead proceeded with the special meeting. (*Id*. at ¶ 116.) In December of 2021, TKTA informed Plaintiff that it had voted to remove Plaintiff from Konnect. (*Id*. at ¶ 131.)

**2.    Plaintiff commences the present action and learns that TKTA had obtained another opportunity with Stellantis**

Despite the ongoing arbitration between Plaintiff and TKTA, Defendants did not agree to arbitrate with Plaintiff. (DN 32, at PageID # 334.) Accordingly, Plaintiff brought this action before the Court. (DN 1.) Plaintiff alleged one count of breach of fiduciary duties, one count of aiding and abetting breaches of fiduciary duties, three counts of tortious interference with contract, one count of tortious interference with business relations, one count of conversion, and one count of civil conspiracy. (DN 1.)

The Court dismissed Plaintiff's claim of breach of fiduciary duty against Bunton because Bunton was not a manager of Konnect, and accordingly, owed no fiduciary duties to Plaintiff or Konnect. (DN 27, at PageID # 249-50.) The Court then dismissed Plaintiff's claim for aiding and abetting breaches of fiduciary duties against Kavanaugh, as such a claim would require an underlying breach by Bunton. (*Id*. at PageID # 257.) The Court also dismissed Plaintiff's claim for conversion, as Plaintiff could not "shoehorn a conversion claim into what is essentially a straightforward breach-of-contract action." (*Id*. at PageID # 264.) However, the Court did not dismiss the remaining claims. The Court also left intact Plaintiff's claim for breach of fiduciary duties against Kavanaugh, and aiding and abetting breaches against Bunton. (*Id*. at PageID # 256-58.)

During this action, Plaintiff learned that Defendants had obtained another business opportunity with Stellantis. In 2023, Stellantis announced that TKTA was joining its North America creative roster to oversee Black audience marketing efforts ("Stellantis Marketing Engagement"). (DN 47 at ¶ 133.) Plaintiff accordingly amended its complaint to allege that Defendants had usurped the Stellantis Marketing Engagement opportunity from Konnect.

### 3.     Plaintiff serves eight subpoenas, TKTA and Konnect move to quash four of them.

In June of 2024, Plaintiff served a subpoena *duces tecum* on eight different entities. (DN 63, at PageID 736.) Four of them are relevant to this discovery dispute: the subpoena served on Toyota Motor Sales, USA, Inc. ("Toyota Subpoena"), Republic Bank ("Republic Subpoena"), Blue & Co. ("Blue Subpoena"), and Stellantis, N.V. ("Stellantis Subpoena"). (DN 63, at PageID # 735; DN 65, at PageID # 890.) Konnect and TKTA, both non-parties to this action, oppose these subpoenas. Konnect has filed a Motion to Quash the Toyota, Republic, and Blue Subpoenas. (DN 63.) TKTA has filed a Motion to Quash the Stellantis Subpoena. (DN 65.)

### a.    Toyota Subpoena.

The Toyota Subpoena was served on Konnect's client, and requests in relevant part:

1.      All agreements, contracts, and/or understandings concerning the provision of managed services and/or any other services between (i) Toyota and/or any Affiliate of Toyota, on the one hand, and (ii) the Company and/or any Affiliate of the Company, on the other hand.

2.      All agreements, contracts, and/or understandings between (i) Toyota and/or any Affiliate of Toyota, on the one hand, and (ii) TKTA and/or any Affiliate of TKTA, on the other hand.

3.      Documents sufficient to show the value of each agreement, contract or understanding identified in Response to Request Nos. 1-2 above.

4.      Documents sufficient to show all monetary payments (including dates and amounts thereof) made by (i) Toyota and/or any Affiliate of Toyota to (ii) the Company, any Affiliate of the Company, TKTA, any Affiliate of TKTA, Kavanaugh, and/or Bunton (iii) for the period January 1, 2021, to the present, and all invoices to which such payments correspond.

(DN 63-2 at PageID # 759.)  Konnect objects to the production of these documents dated after

November 23, 2021.  (DN 63, at PageID # 740.)

### b.    Republic Subpoena.

The Republic Subpoena was served on the bank that Konnect had done business with.  (DN

63-3.)  It requests:

1.      All account statements for, and all other Documents sufficient to show all activity in, each account maintained at Republic in the name of or for the benefit of TKTKonnect for the period January 1, 2016, to the present.

2.      All account statements for, and all other Documents sufficient to show all activity in, each account maintained at Republic in the name of or for the benefit of TKTA for the period January 1, 2021, to the present.

3.      All Documents concerning all loans made to any Person or entity that were collateralized or secured, in whole or in part, by assets of TKTKonnect and/or as to which the assets of TKTKonnect were pledged as collateral or security.

(DN 63-3, at PageID # 782.)  Konnect objects to the production of these documents dated after

November 23, 2021.

### c.    Blue Subpoena

The Blue Subpoena was served on the accounting firm that Konnect had done business with. (DN 63-4.) It requests:

> 1. Documents sufficient to show all payments made to, or received by or on behalf of, TKTKonnect from Toyota for the period January 1, 2016, to the present.
> 2. Documents sufficient to show all payments made to, or received by or on behalf of, TKTKonnect in connection with the Toyota Contract for the period January 1, 2016, to the present.
> 3. Documents sufficient to show all payments and/or transfers of moneys made to any Person or entity from moneys paid to or received by or on behalf of TKTKonnect from Toyota for the period January 1, 2016, to the present.
> 4. Documents sufficient to show all payments and/or transfers of moneys made to any Person or entity from moneys paid to or received by or on behalf of TKTKonnect in connection with the Toyota Contract for the period January 1, 2016, to the present.
> 5. All Communications between You on the one hand and TKTA and/or TKTKonnect on the other hand concerning the amendment, extension, renewal, continuation, and/or expiration of the Toyota Contract for the period November 1, 2021, to the present.
> 6. All Documents sufficient to show all payments made to, or received by or on behalf of, TKTA from Stellantis during the period January 1, 2021 to the present.
> 7. All Communications between You on the one hand and TKTA, Bunton or Kavanaugh on the other hand concerning TBG, Rose, Jones and/or any other TBG employee or agent during the period January 1, 2021 to the present.

(DN 63-4, at PageID # 804.) Konnect only objects to production of these documents dated after November 23, 2021.

### d.    Stellantis Subpoena

The Stellantis Subpoena requests:

> 1. All agreements, contracts, and/or understandings between or among (i) Stellantis and/or any Affiliate of Stellantis, on the one hand, and (ii) the Company and/or any Affiliate of the Company, on the other hand.
> 2. All agreements, contracts, and/or understandings between or among (i) Stellantis and/or any Affiliate of Stellantis, on the one hand, and (ii) TKTA, any Affiliate of TKTA, and/or TKT Collab on the other hand including, without limitation, concerning the Stellantis-NBL Program and/or the Stellantis Marketing Engagement.
> 3. All agreements, contracts, and/or understandings between or among (i) Stellantis and/or any Affiliate of Stellantis, on the one hand, and (ii) Kavanaugh, Bunton, any Affiliate of Kavanaugh, and/or any Affiliate of Bunton, on the other

hand, including, without limitation, concerning the Stellantis-NBL Program and/or the Stellantis Marketing Engagement.

4.    Documents sufficient to show all monetary payments (including the dates and amounts thereof) made by (i) Stellantis and/or any Affiliate of Stellantis to (ii) the Company, any Affiliate of the Company, TKTA, any Affiliate of TKTA, TKT Collab, Kale & Flax, Nally, Kavanaugh, any Affiliate of Kavanaugh, Bunton, and/or any Affiliate of Bunton (iii) for the period January 1, 2021, to the present, and the invoices to which such payments correspond.

5.    All Documents and Communications showing or discussing monetary or financial budgets, forecasts, or projections for (i) the Stellantis Marketing Engagement, the Stellantis-NBL Program, and/or any other work being performed for (ii) Stellantis or any Affiliate of Stellantis by (iii) the Company, any Affiliate of the Company, TKTA, any Affiliate of TKTA, TKTA Collab, Kale & Flax, Nally, Bunton, Kavanaugh, any Affiliate of Kavanaugh, and/or any Affiliate of Bunton.

6.    All Document showing the scope of work or statements of work for the Stellantis-NBL Program.

7.    All Document showing the scope of work or statements of work for the Stellantis Marketing Engagement.

8.    All presentations made and Documents submitted to Stellantis or any Affiliate of Stellantis by the Company, any Affiliate of the Company, TKTA, any Affiliate of TKTA, and/or TKT Collab concerning the provision of managed or other services including, without limitation, the Stellantis-NBL Program and/or the Stellantis Marketing Engagement.

9.    All Documents and Communications with or concerning Rose, Jones, TBG, and/or any employee or agent of TBG.

10.    All Documents and Communications concerning the role and/or participation of Rose, Jones, and/or any other Person or agent affiliated with TBG in connection with the pursuit of business opportunities from Stellantis and/or any Affiliate of Stellantis.

11.    All Documents and Communications concerning representations or statements made by the Company, any Affiliate of the Company, TKTA, any Affiliate of TKTA, Bunton, and/or Kavanaugh to Stellantis concerning the fact that neither Rose nor Jones would provide any service or have any continuing role in the provision of any services to Stellantis, including, without limitation, in connection with the Stellantis-NBL Program and/or the Stellantis Marketing Engagement.

12.    All Communications with Kavanaugh and/or Bunton for the period January 1, 2021, to the present concerning the Stellantis-NBL Program and/or the Stellantis Marketing Engagement.

13.    All Documents and Communications concerning all managed and other services and all other business opportunities pursued with or from Stellantis and/or any Affiliate of Stellantis by the Company, any Affiliate of the Company, TKTA, any Affiliate of TKTA, and/or TKT Collab since January 2021, other than the Stellantis-NBL Program and the Stellantis Marketing Engagement.

14.    All Documents and Communications concerning the participation of Rose, Jones and Bunton in the solicitation or pursuit of any business opportunities with

or from Stellantis and/or any Affiliate of Stellantis, including, without limitation, participation in the Stellantis-NBL Program, the Stellantis Marketing Engagement, and/or the Stellantis Collaborative Growth Initiative Program.

(DN 65-1, at PageID # 916-18.)  TKTA objects to all these requests.  (DN 65-2, at PageID # 928.)

## II.    Discussion

### A.    Standard of Review

The scope of discovery is within the sound discretion of the trial court.  *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981).  The reviewing court reviews a ruling by the trial court limiting or denying discovery under an abuse of discretion standard.  *Id.*  An abuse of discretion exists when the reviewing court is "firmly convinced" that a mistake has been made. *Bush v. Rauch*, 38 F.3d 842, 848 (6th Cir. 1994).

### B.    Motions to Quash

Under Rule 26(b)(1), the Parties may obtain discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed R. Civ. P. 26(b)(1).  Rule 45 allows parties, *inter alia*, to command a nonparty to appear at a certain time and place to testify or produce documents.  Fed. R. Civ. P. 45(a)(1)(A)(iii).  Courts have held that the scope of discovery under a subpoena is the same as the scope of discovery under Rule 26. *Hendricks v. Total Quality Logistics, LLC*, 275 F.R.D. 251, 253 (S.D. Ohio 2011).  The court for the district where compliance is required may quash or modify any subpoena that requires disclosure of "a trade secret or other confidential research, development, or commercial information."  Fed. R. Civ. P. 45(d)(3)(B)(i).  However, under such circumstances, in lieu of quashing or modifying the subpoena, the Court may order production under specified conditions upon a showing by the party who served the subpoena of substantial need and that "the subpoenaed person will be reasonably compensated."  Fed. R. Civ. P. 45(d)(3)(C).  Additionally, a party or

person from whom discovery is sought may move for a protective order limiting discovery in the court where the action is pending. FED. R. CIV. P. 26(c)(1).

### 1. Movants Konnect and TKTA are both permitted to challenge these subpoenas.

There are two matters that the Court must address before turning to the merits of TKTA and Konnect's Motions. First, Plaintiff argues that neither Konnect nor TKTA have standing to challenge the subpoenas because they were not the recipients of the subpoenas. (DN 74, at PageID # 974; DN 75, at PageID # 1033.) Second, Plaintiff argues that neither Konnect nor TKTA may challenge these subpoenas because they are not Parties. (DN 75, at PageID # 1028-29.) Neither is correct.

First, TKTA and Konnect may challenge these subpoenas. Anyone with a legitimate interest at stake in these subpoenas would be able to challenge them before this Court. Certainly, many courts have held that, absent a claim of privilege, a person does not have standing to move to quash a subpoena served on another. *E.g., Langford v. Chrysler Motors Corp.*, 513 F.2d 1121, 1126 (2d Cir. 1975). But many courts have also held that a person may instead move for a protective order in response to a subpoena issued to another for irrelevance or undue burden, even when they would not have standing under Rule 45. *E.g., Louisiana Corral Mgmt., LLC v. Axis Surplus Ins. Co.*, 650 F.Supp.3d 491, 501 (E.D. La. 2023) ("Although a party does not have standing under Rule 45 to raise certain challenges, a party does have standing to challenge relevance under Rule 26(c)."). As both the issuing and compliance Court, this Court may either quash the subpoenas or issue a protective order as appropriate, and a protective order is appropriate when a movant is asserting its own interests. *See Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*, 314 F.R.D. 304, 306 (S.D. Ind. 2016) ("The court finds that Noble Roman's has sufficient legitimate interests of its own with respect to the Privet Fund subpoenas to be heard on whether

the subpoenas should be quashed, or a protective order issued prohibiting that discovery by Hattenhauer."). Based on both Motions to Quash, Konnect and TKTA are only asking the Court to prohibit discovery of the requested documents or, at the very least, order an Attorneys' Eyes Only ("AEO") designation. As such, the Court may interpret these Motions as either Motions to Quash, or as Motions for a Protective Order. *Cf. Pogue v. Nw. Mut. Life Ins. Co.*, No. 3:14-CV-598-CRS-CHL, 2016 WL 3094031, at *4 (W.D. Ky. June 1, 2016) ("In this case, it is clear from Pogue's motion and reply that he seeks an order quashing the subpoena of Dr. Lewis pursuant to Rule 45; he does not seek a protective order under Rule 26(c).").

Second, the fact that neither TKTA nor Konnect are Parties to this suit does not mean they lack a legitimate interest at stake. Under Rule 45, the Court may quash or modify a subpoena "[t]o protect a person subject to *or affected by* a subpoena." FED. R. CIV. P. 45(d)(3) (emphasis added). Under Rule 26, the Court may "issue an order to protect a party *or person* from annoyance, embarrassment, oppression, or undue burden or expense." FED. R. CIV. P. 26(c)(1) (emphasis added). Neither of these rules prevents the Court from limiting discovery to the scope of Rule 26 just because a non-party is moving to limit discovery. In fact, courts have a duty to limit discovery to the scope of Rule 26, regardless of whether anyone files a motion at all. FED. R. CIV. P. 26(b)(2)(C) ("On a motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that … the proposed discovery is outside the scope permitted by Rule 26(b)(1)."). Other courts have even held that nonparties may have a legitimate interest in getting a protective order to guard their confidential commercial information. *E.g., High Point SARL v. Sprint Nextel Corp.*, 280 F.R.D. 586, 592 (D. Kan. 2012). Accordingly, both TKTA and Konnect may challenge these subpoenas.

> **2.    Neither Konnect nor TKTA has shown good cause to order an AEO Provision.**

Under Rule 26, the Court may only limit discovery for good cause. FED. R. CIV. P. 26(c)(1). The burden of showing good cause is on the movant. *Nix v. Sword*, 11 F. App'x. 498, 500 (6th Cir. 2001). In the business context, the movant must show that disclosure would cause a specific harm. *Waite, Schneider, Bayless & Chesley Co. L.P.A. v. Davis*, No. 1:11-CV-0851, 2012 WL 3600106, at *5 (S.D. Ohio Aug. 21, 2012). Sometimes movants, like those here, will ask for an AEO designation, but such a designation is "the most restrictive possible protective order" as it confines discovery to the attorneys, away from the clients. *Penn, LLC v. Prosper Bus. Dev. Corp.*, No. 2:10-CV-0993, 2012 WL 5948363, at *4 (S.D. Ohio Nov. 28, 2012). Accordingly, courts will usually examine six factors to determine whether there is good cause to order an AEO provision to protect confidential commercial information: (1) the extent to which those outside the movant's business know of the information; (2) the extent to which employees in the movant's business and others involved know of the information; (3) the measures taken by the movant to keep the information secret; (4) the value of the information to the movant and to the movant's competitors; (5) the amount of effort or money the movant spent in developing the information; and (6) the ease or difficulty of properly acquiring the information by others. *Stout v. Remetronix, Inc.*, 298 F.R.D. 531, 535 (S.D. Ohio 2014). Logically, if the factors do not justify an AEO designation, then they do not justify prohibiting disclosure either.

Here, neither Konnect nor TKTA have shown enough facts to justify an AEO provision. TKTA's Motion only provides enough information for the Court to conclude that two of the six factors weigh in TKTA's favor. TKTA's pricing structure and fees are certainly valuable to its business because that is how it maintains its competitive edge. (DN 65, at PageID # 897.) If competitors were to obtain that information, they could undercut TKTA and take its clients. *See Alph C. Kaufman, Inc. v. Cornerstone Indus. Corp.*, 540 S.W.3d 803, 818 (Ky. Ct. App. 2017)

("Hess testified this information was valuable and confidential because it would allow a competitor to underbid Cornerstone and to negotiate favorable deals with Cornerstone's suppliers that would in turn allow the competition to match or narrowly beat Cornerstone's bids."). TKTA also asserts that this information is not known to its competitors. (DN 65, at PageID # 897.) This certainly weighs in favor of limiting discovery. *See Specialty Auto Parts USA, Inc. v. Holley Performance Prod., Inc.*, No. 1:17-CV-00147-JRW-LLK, 2020 WL 1914817, at *5 (W.D. Ky. Apr. 20, 2020) ("Accordingly, it can be said that information is not widely, if at all, known outside of Holley. The first factor, therefore, weighs heavily in Holley's favor."). But TKTA does not even address the other four factors, let alone explain why they should weigh in its favor. TKTA does not say what protective measures it has taken to safeguard the information. *Cf. Id.* at *6 ("Holley's electronic information is password protected and accessible only to those employees who[se] jobs require such access. Hard copies of the information are stored in secure cabinets and rooms that require key cards."). The Court also does not know how accessible such information is to employees within TKTA, or to those involved with TKTA. *Cf. Id.* at *5 ("Holley's … employees only have access to information they need to perform their specific work duties."). The fact that TKTA's clients even have this information weighs against TKTA. The Court also does not know the amount of effort or money TKTA spent in developing the information. *Cf. Id.* at *8 ("[I]t cost Holley tens of millions of dollars over the past ten years to develop its trade secrets."). Finally, the Court does not know how easily others could properly duplicate or acquire the information. Accordingly, the Court finds no good cause to issue an AEO designation for the requested information in the Stellantis Subpoena.

Konnect's Motion to Quash is even more deficient. Konnect's barebones assertion that the requested information would cause it harm if it were disclosed is far from the required standard

that the movant "articulate specific facts showing 'clearly defined and serious injury' resulting from the discovery sought." *Nix*, 11 F. App'x. at 500 (quoting *Avirgan v. Hull*, 118 F.R.D. 252, 254 (D.D.C. 1987)).  Konnect does not specify what harm it would suffer if the information were disclosed, other than the fact that its competitors would be able to improve their abilities to attract customers and compete in the market.  (DN 63, at PageID # 741.)  That is not a specific harm; it is true of every trade secret.  *Church Mut. Ins. Co. v. Smith*, No. 3:14–cv–749–JHM, 2015 WL 3480656, at *4 (W.D. Ky. June 2, 2015) ("Trade secrets are valuable because they *are secret* – the secret information gives the user a competitive edge in a market for the very reason that the information is unknown to competitors.").  Konnect cannot simply state that the information is confidential and expect the Court to take it at its word; it must show more.  *Waite, Schneider, Bayless & Chesley Co. L.P.A. v. Davis*, No. 1:11-CV-0851, 2013 WL 146362, at *6 (S.D. Ohio Jan. 14, 2013) ("That documents are confidential 'is not itself grounds for quashing a subpoena.'") (quoting *Hackmann v. Auto Owners Ins. Co.*, No. CIV.A. 2:05-CV-876, 2009 WL 330314, at *2 (S.D. Ohio Feb. 6, 2009)).  Accordingly, the Court finds no good cause to either issue an AEO provision or quash the subpoenas.

### 3.    The requested information is relevant to Plaintiff's claims.

Nevertheless, information must be relevant to be discoverable.  FED. R. CIV. P. 26(b)(1). Relevant information includes "any matter that bears on, or that reasonably could lead to other matter that could bear on" any party's claim or defense. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

> **a)    The requested information is relevant to show damages for Plaintiff's claims of tortious interference with contract and tortious interference with prospective business relations.**

If Plaintiff proves that Defendants caused TKTA to breach its contract with Plaintiff, then Defendants are liable to Plaintiff for damages flowing from the breach of contract. Restatement (Second) of Torts § 766 (Am. L. Inst. 1979). But a plaintiff must prove his or her damages with reasonable certainty. *See Musselman Bros. v. Dial-Huff & Assocs., Inc.*, 826 S.W.2d 838, 840 (Ky. Ct. App. 1992). One method that Plaintiffs can prove damages is by demonstrating lost profits. *Carmichael-Lynch-Nolan-Advert. Agency, Inc. v. Bennet & Assocs., Inc.*, 561 S.W.2d 99, 102 (Ky. Ct. App. 1977). This is true for a claim of tortious interference with prospective business relations as well. *CMI, Inc. v. Intoximeters, Inc.*, 918 F.Supp. 1068, 1080 (W.D. Ky. 1995) (holding that because both torts were related, both required similar proof of damages).

Here, Plaintiff alleges that Defendants caused TKTA to breach its Operating Agreement with Plaintiff. (DN 47 at ¶¶ 166-189.) Plaintiff alleges that, because of this breach, it was terminated from Konnect. (*Id.* at ¶ 152.) Accordingly, Plaintiff has been unable to reap the benefits of Konnect's continued relationship with Toyota. (*Id.* at ¶ 36.) ("Suffice to say, TBG's opportunity to continue to reap the benefits of forming and building the Company, the expected renewal and expansion of the Toyota Contract, and the Stellantis and other Company opportunities has tremendous value.").

Regarding the Toyota and Blue Subpoenas, Konnect objects to the production of documents concerning the payments and value of the Toyota Contract. (DN 63, at PageID # 740.) Specifically, Konnect only objects to the production of documents dated after November 23, 2021. (*Id.*) Ironically, these documents are the most relevant, as they are likely to show the value of the Toyota Contract after Plaintiff was terminated from Konnect, and the resulting lost profits.

Regarding the Stellantis Subpoena, Request Nos. 1, 2, 3, 4, 12, and 13 request information that is similarly relevant to the value of the Stellantis Contract. Accordingly, the requested information is relevant to show the damages Konnect incurred from TKTA's alleged interference.

Regarding the Republic Subpoena, Konnect objects to the production of documents relating to all bank accounts and loans from either January 1, 2016, or January 1, 2021, to the present. (DN 63, at PageID # 740.) Konnect again objects only to the production of these documents dated after November 23, 2021. (*Id.*) While these documents are certainly relevant to the value of the Toyota Contract, they contain information even broader in scope. But this information is relevant too, as it is relevant to show Konnect's value both before and after Plaintiff was terminated. This in turn is relevant to the damages Plaintiff suffered from the alleged breach because it bears on the profits Plaintiff would have enjoyed but for its termination from Konnect. Accordingly, the information requested by each of the subpoenas is relevant to establishing Plaintiff's damages.

> **b) The requested information in the Stellantis Subpoena is relevant to Plaintiff's claim for tortious interference with prospective business relations.**

The Supreme Court of Kentucky has held that Sections 766B, 767, and 773 of the Restatement (Second) of Torts "fairly reflect the prevailing law of Kentucky" regarding claims of tortious interference with business relations. *Nat'l Collegiate Athletic Ass'n By & Through Bellarmine Coll. v. Hornung*, 754 S.W.2d 855, 857 (Ky. 1988). Accordingly, these sections are persuasive in determining whether the requested information is relevant.

To prove tortious interference with business relations, Plaintiff must prove that Defendants "intentionally and improperly" interfered with Konnect's valid expectancy of a business relationship. Restatement (Second) of Torts § 766B (Am. L. Inst. 1979); *Ventas, Inc. v. Health*

*Care Prop. Invs., Inc.*, 635 F. Supp. 2d 612, 621 (W.D. Ky. 2009).  Here, the requested information in the Stellantis Subpoena is relevant to prove Plaintiff's claim for tortious interference with business relations because the requested information is relevant to show: (1) that Konnect had a valid expectation of a contractual relationship with Stellantis; (2) that Defendants intentionally interfered with that prospective contractual relationship; and (3) that Defendants' interference was improper.

> **(1)    The requested information is relevant to show that Konnect had a valid expectation of a contractual relationship with Stellantis.**

To succeed on a claim for tortious interference with business relations, Plaintiff must first prove that Konnect had a valid expectation of a business relationship with Stellantis.  *Ventas*, 635 F. Supp. 2d at 621.  A plaintiff has a valid expectation of a business relationship when he or she bases his or her expectancy on "a reasonable likelihood or a probability, not mere wishful thinking" that he or she will enter a business relationship.  *Id.* (quoting *Lucas v. Monroe Cnty.*, 203 F.3d 964, 979 (6th Cir. 2000)).

Request Nos. 1, 4, 5, 6, 7, 8, 9, 10, and 13 are all relevant to determine whether Konnect had a valid business expectancy with Stellantis.  Plaintiff alleges that Konnect had made two presentations to Stellantis to promote its ability to manage Stellantis's indirect spend services. (DN 47 at ¶ 217.)  Plaintiff also alleges that the Stellantis Opportunity was within the ordinary course of Konnect's business, and that Konnect was able to avail itself of the opportunity.  (*Id.* at ¶¶ 214-218.)   If Konnect had a reasonable expectation that it would secure the Stellantis Opportunity, then the presentations, documents, and communications requested in the Stellantis subpoena would likely show it.  Accordingly, the requested information is relevant.

>        **(2)    The requested information is relevant to establish that Defendants' alleged interference with Konnect's prospective contractual relationship was intentional.**

To succeed on a claim for tortious interference of prospective business relations, Plaintiff must prove that Defendants intentionally interfered with the prospective contract. *Hornung*, 754 S.W.2d at 857. To prove intentional interference, Plaintiff must show that Defendants either desired to interfere with Konnect's prospective business relationship or were substantially certain that their conduct would do so. Restatement (Second) of Torts § 767 cmt. d (Am. L. Inst. 1979).

Request Nos. 2, 3, 4, 8, 11, 12, 13, and 14 are all relevant to determine whether Defendants intentionally interfered with Konnect's prospective contract with Stellantis. Plaintiff alleges that Defendants committed "numerous overt acts" for the purpose of usurping the Stellantis business opportunity. (DN 47 at ¶ 239.) Plaintiff further alleges that Defendants' interference caused the Stellantis Opportunity to be taken by TKTA rather than Konnect. (*Id.* at ¶ 241.) As such, the requested documents are all relevant to determine whether TKTA not only pursued the Stellantis business opportunity but did so with the intent to interfere with Konnect's prospective business relationship with Stellantis.

>        **(3)    The requested information is relevant to establish that Defendants' alleged interference with Konnect's prospective contractual relationship was improper.**

It is not enough for Plaintiff to prove that Defendants intended to interfere with Konnect's prospective contract with Stellantis. Plaintiff must also prove that Defendants' interference was improper. *Hornung*, 754 S.W.2d at 858. In determining whether interference is improper, courts consider seven factors: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual

interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties.  Restatement (Second) of Torts § 767 (Am. L. Inst. 1979).

Request Nos. 2, 3, 5, 8, 12, 13, and 14 are all relevant to determine the nature of Defendants' alleged interference with Konnect's business relations.  While there is no requirement as to the kind of conduct that results in interference, interference is often by inducement. Restatement (Second) of Torts § 766 cmt. k (Am. L. Inst. 1979).  Inducement includes any conduct conveying to a third person the actor's desire to influence him or her not to deal with the other.  *Id*. If Defendants induced Stellantis not to enter a contract with Konnect, and to instead enter a contract with TKTA, such communications between Stellantis and Defendants would likely show that.

### 4.    The information should be disclosed with appropriate safeguards.

Under Rule 26, a court may, and often does, impose appropriate safeguards when ordering disclosure of confidential commercial information.  FED. R. CIV. P. 26(c)(1)(G); *Fed. Open Mkt. Comm. of Fed. Rsrv. Sys. v. Merrill*, 443 U.S. 340, 362 n. 24 (1979).  The Court finds that some safeguards are appropriate here.

TKTA and Konnect have both asked this Court to enter an AEO designation.  (DN 63, at PageID # 736; DN 65, at PageID # 899.)  As stated above, this designation is not appropriate.  But the Court notes that the Parties have been unable to agree to a confidentiality provision concerning the requested information.  (*Id*. at PageID # 894.)  The Court is also concerned by TKTA's assertion that Plaintiff "has a track record of sharing proprietary information with inappropriate third-parties." (DN 65-2, at PageID # 928.)  Accordingly, the Court finds that some safeguards are appropriate.  The Court will deny both Motions to Quash, but the Court will impose provisions to protect Konnect and TKTA's confidential commercial interests.

### III.  Order

For the reasons stated above, IT IS HEREBY ORDERED that:

(1)  Konnect's Motion to Quash (DN 63) is **DENIED**.

(2)  TKTA's Motion to Quash (DN 65) is **DENIED**.

(3)  The requested information may be disclosed with the same safeguards in the Court's previous protective order.  (DN 84.)

February 20, 2025

Colin H Lindsay, Magistrate Judge
United States District Court

cc:  Counsel of record